# DOBBERT *v.* FLORIDA

No. 76–5306.   Argued March 28, 1977—Decided June 17, 1977

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., filed a concurring opinion, *post,* p. 303. BRENNAN and MARSHALL, JJ., filed a dissenting statement, *post,* p. 304. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 304.

*Louis O. Frost, Jr.,* argued the cause and filed a brief for petitioner.

*Charles W. Musgrove,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the briefs was *Robert L. Shevin,* Attorney General.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner was convicted of murder in the first degree, murder in the second degree, child abuse, and child torture. The victims were his children. Under the Florida death penalty statute then in effect he was sentenced by the trial judge to death for the first-degree murder. The Florida Supreme Court affirmed, and we granted certiorari to consider whether changes in the Florida death penalty statutes subjected him to trial under an *ex post facto* law or denied him equal protection of the laws, and whether the significant amount of pretrial publicity concerning the crime deprived petitioner of his right to a fair trial. We conclude that petitioner has not shown the deprivation of any federal constitutional right, and affirm the judgment of the Florida Supreme Court.

I

Petitioner was convicted of first-degree murder of his daughter Kelly Ann, aged 9, and second-degree murder of his son Ryder Scott, aged 7. He was also found guilty of tortur-

---

*\*Howard B. Eisenberg* filed a brief for the National Legal Aid and Defender Assn. as *amicus curiae* urging reversal.

ing his son Ernest John III, aged 11, and of abusing his daughter Honore Elizabeth, aged 5. The brutality and heinousness of these crimes are relevant both to petitioner's motion for a change of venue due to pretrial publicity and to the trial judge's imposition of the sentence of death. The trial judge, in his factual findings at the sentencing phase of the trial, summarized petitioner's treatment of his own offspring as follows:

> "The evidence and testimony showed premeditated and continuous torture, brutality, sadism and unspeakable horrors committed against all of the children over a period of time." App. 47.

The judge then detailed some of the horrors inflicted upon young Kelly Ann, upon which he relied to meet the statutory requirement that aggravating circumstances be found:

> "Over the period of time of the latter portion of Kelly Ann's short, tortu[r]ous life the defendant did these things to her on one or many occasions:
> "1. Beat her in the head until it was swollen.
> "2. Burned her hands.
> "3. Poked his fingers in her eyes.
> "4. Beat her in the abdomen until 'it was swollen like she was pregnant.'
> "5. Knocked her against a wall and 'when she fell, kicked her in the lower part of the body.'
> "6. Held her under water in both the bath tub and toilet.
> "7. Kicked her against a table which cut her head— then defendant sewed up her wound with needle and thread.
> "8. Scarred her head and body by beating her with a belt and board—causing marks from her cheek, across the neck and down her back—which injuries worsened without treatment 'until the body juices came out.'

"9. On one occasion beat her continuously for 45 minutes.

"10. On many occasions kicked her in the stomach with his shoes on, and on the night she died he kicked her a number of times.

"11. Kept her out of school so that the many scars, cuts and bruises on her body would not be seen by others.

"12. Defendant made no effort to get professional medical care and attention for the child and in fact actively prevented any out-siders from discovering her condition.

"13. Choked her on the night she died and when she stopped breathing he placed her body in a plastic garbage bag and buried her in an unmarked and unknown grave." *Id.*, at 47–48.

This sordid tale began to unravel in early 1972 when Ernest John III was found battered and wandering in Jacksonville, Fla.[1] An arrest warrant was issued for petitioner, who evidently had fled the area. About a year later, Honore Elizabeth was found in a Ft. Lauderdale hospital with a note pinned to her clothing asking that she be sent to her mother in Wisconsin. Shortly thereafter petitioner's abandoned automobile was found near a bridge with a suicide note on the front seat. Petitioner, however, had fled to Texas, where he was eventually arrested and extradited to Florida.

Prior to trial, petitioner applied to the Supreme Court of Florida for a Constitutional Stay of Trial,[2] alleging the application of an *ex post facto* law and a violation of equal

---

[1] These background facts, not referred to in the opinion of the Supreme Court of Florida, 328 So. 2d 433 (1976), are not disputed and are gleaned from the briefs of the parties. See Brief for Petitioner 4–13; accord, Brief for Respondent 3.

[2] See Florida Appellate Rule 4.5g.

protection. *Id.,* at 81–86. The application was denied. Petitioner also moved in the lower court for a change of venue, alleging that he was charged with "inherently odious" acts, *id.,* at 17, and that extensive publicity regarding his flight, extradition, and arrest, as well as a search for bodies by the Jacksonville Police Department, had rendered impossible a fair and impartial trial in Duval County. *Id.,* at 17–18. The trial judge took the motion under advisement and issued an order enjoining anyone connected with the trial from releasing any statement about the case to the news media. *Id.,* at 25–26. The motion was later denied.

Trial was had and the jury found petitioner guilty of, *inter alia,* murder in the first degree. Pursuant to the Florida death penalty statute then in effect, a sentencing hearing was held before the judge and jury. The jury by a 10-to-2 majority—found sufficient mitigating circumstances to outweigh any aggravating circumstances and recommended a sentence of life imprisonment. The trial judge, pursuant to his authority under the amended Florida statute, overruled the jury's recommendation and sentenced petitioner to death. The Florida Supreme Court affirmed over two dissents.

## II

Petitioner makes three separate claims based on the prohibition against *ex post facto* laws, and a related claim based upon the Equal Protection Clause of the Fourteenth Amendment. His first *ex post facto* claim is addressed to the change in the function of judge and jury in the imposition of death sentences in Florida between the time he committed the acts charged and the time he was tried for them. The second *ex post facto* claim is grounded on his contention that at the time he acted there was no valid death penalty statute in effect in Florida. The third claim relates to the more stringent parole requirements attached to a life sentence under

the new law. A discussion of the relevant changes in Florida death-sentencing procedures brings these claims into focus.

The murders of which petitioner was convicted were alleged to have occurred on December 31, 1971 (Kelly Ann), and between January 1 and April 8, 1972 (Ryder Scott). During that period of time, Fla. Stat. Ann. §§ 775.082 (1971) and 921.141 (Supp. 1971–1972), as then written, provided that a person convicted of a capital felony was to be punished by death unless the verdict included a recommendation of mercy by a majority of the jury.[3]

On June 22, 1972, this Court struck down a Georgia death penalty statute as violative of the Eighth and Fourteenth Amendments. *Furman* v. *Georgia,* 408 U. S. 238. Shortly thereafter, on July 17, 1972, in *Donaldson* v. *Sack,* 265 So. 2d 499, the Florida Supreme Court found the 1971 Florida death penalty statutes inconsistent with *Furman.* Late in 1972 Florida enacted a new death penalty procedure, 1973 Fla. Laws, c. 72–724, amending, *inter alia,* §§ 775.082 and 921.141.[4]

---

[3] The text of those statutes is as follows:

"Recommendation to mercy—A defendant found guilty by a jury of an offense punishable by death shall be sentenced to death unless the verdict includes a recommendation to mercy by a majority of the jury. When the verdict includes a recommendation to mercy by a majority of the jury, the court shall sentence the defendant to life imprisonment. A defendant found guilty by the court of an offense punishable by death on a plea of guilty or when a jury is waived shall be sentenced by the court to death or life imprisonment." Fla. Stat. Ann. § 921.141 (Supp. 1971–1972).

"Penalties for felonies and misdemeanors.—(1) A person who has been convicted of a capital felony shall be punished by death unless the verdict includes a recommendation to mercy by a majority of the jury, in which case the punishment shall be life imprisonment. A defendant found guilty by the court of a capital felony on a plea of guilty or when a jury is waived shall be sentenced to death or life imprisonment, and [*sic*] the discretion of the court." Fla. Stat. Ann. § 775.082 (1971).

[4] The constitutionality of this statute has been upheld by the Florida

The opinion of Mr. Justice Stewart, Mr. Justice Powell, and Mr. Justice Stevens in *Proffitt* v. *Florida,* 428 U. S. 242 (1976), in which the constitutionality of this statute was upheld, details at length the operation of the revised § 921.141.[5]

Supreme Court, *State* v. *Dixon,* 283 So. 2d 1 (1973), and by this Court, *Proffitt* v. *Florida,* 428 U. S. 242 (1976).

[5] The full text of revised § 921.141 (Supp. 1976–1977) is as follows:

"921.141  Sentence of death or life imprisonment for capital felonies; further proceedings to determine sentence

"(1) Separate proceedings on issue of penalty.—Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by § 775.082.  The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.  If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a special juror or jurors as provided in Chapter 913 to determine the issue of the imposition of the penalty.  If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose, unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) and (7).  Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.  However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitutions of the United States or of the State of Florida.  The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

"(2) Advisory sentence by the jury.—After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

"(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (6);

"(b) Whether sufficient mitigating circumstances exist as enumerated in

428 U. S., at 247–251.   After a defendant is found guilty of a capital felony, a separate sentencing hearing is held before the trial judge and the trial jury.   Any evidence that the judge

---

subsection (7), which outweigh the aggravating circumstances found to exist; and

"(c) Based on these considerations, whether the defendant should be sentenced to life [imprisonment] or death.

"(3) Findings in support of sentence of death.—Notwithstanding the recommendation of a majority of the jury, the court after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

"(a) That sufficient aggravating circumstances exist as enumerated in subsection (6), and

"(b) That there are insufficient mitigating circumstances, as enumerated in subsection (7), to outweigh the aggravating circumstances.

"In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (6) and (7) and upon the records of the trial and the sentencing proceedings.   If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with section 775.082.

"(4) Review of judgment and sentence.—The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the Supreme Court for good cause shown.   Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Supreme Court.

"(5) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:

"(a) The capital felony was committed by a person under sentence of imprisonment.

"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

deems relevant to sentencing may be admitted, and certain evidence relating to aggravating or mitigating circumstances must be admitted. The jury, by a majority vote, then renders an advisory decision, not binding on the court, based upon these aggravating and mitigating circumstances. The court must then also weigh the aggravating and mitigating circumstances. If the court imposes a sentence of death, it must set forth written findings of fact regarding the aggravating and mitigating circumstances. A judgment of conviction and sen-

---

"(c) The defendant knowingly created a great risk of death to many persons.

"(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

"(f) The capital felony was committed for pecuniary gain.

"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

"(h) The capital felony was especially heinous, atrocious, or cruel.

"(6) Mitigating circumstances.—Mitigating circumstances shall be the following:

"(a) The defendant has no significant history of prior criminal activity.

"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(c) The victim was a participant in the defendant's conduct or consented to the act.

"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

"(e) The defendant acted under extreme duress or under the substantial domination of another person.

"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(g) The age of the defendant at the time of the crime."

tence of death is then subject to an automatic, priority review by the Florida Supreme Court. It is in the light of these changes that we must adjudge petitioner's *ex post facto* claims.

## A

Petitioner argues that the change in the role of the judge and jury in the imposition of the death sentence in Florida between the time of the first-degree murder and the time of the trial constitutes an *ex post facto* violation. Petitioner views the change in the Florida death-sentencing procedure as depriving him of a substantial right to have the jury determine, without review by the trial judge, whether that penalty should be imposed. We conclude that the changes in the law are procedural, and on the whole ameliorative,[6] and that there is no *ex posto facto* violation.

Article I, § 10, of the United States Constitution prohibits a State from passing any "ex post facto Law." Our cases have not attempted to precisely delimit the scope of this Latin phrase, but have instead given it substance by an accretion of case law. In *Beazell* v. *Ohio,* 269 U. S. 167, 169–170 (1925), Mr. Justice Stone summarized for the Court the characteristics of an *ex post facto* law:

> "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*"

---

[6] These are independent bases for our decision. For example, in *Beazell* v. *Ohio,* 269 U. S. 167 (1925), we found a procedural change not *ex post facto* even though the change was by no means ameliorative.

It is equally well settled, however, that "[t]he inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." *Gibson* v. *Mississippi,* 162 U. S. 565, 590 (1896). "[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, see *Malloy* v. *South Carolina,* 237 U. S. 180, 183, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Beazell* v. *Ohio, supra,* at 171.

Even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.* For example, in *Hopt* v. *Utah,* 110 U. S. 574 (1884), as of the date of the alleged homicide a convicted felon could not have been called as a witness. Subsequent to that date, but prior to the trial of the case, this law was changed; a convicted felon was called to the stand and testified, implicating Hopt in the crime charged against him. Even though this change in the law obviously had a detrimental impact upon the defendant, the Court found that the law was not *ex post facto* because it neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, nor changed the proof necessary to convict. *Id.,* at 589.

In *Thompson* v. *Missouri,* 171 U. S. 380 (1898), a defendant was convicted of murder solely upon circumstantial evidence. His conviction was reversed by the Missouri Supreme Court because of the inadmissibility of certain evidence. Prior to the second trial, the law was changed to make the evidence admissible and defendant was again convicted. Nonetheless, the Court held that this change was procedural and not violative of the *Ex Post Facto* Clause.

In the case at hand, the change in the statute was clearly procedural. The new statute simply altered the methods

employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime. The following language from *Hopt* v. *Utah, supra,* applicable with equal force to the case at hand, summarizes our conclusion that the change was procedural and not a violation of the *Ex Post Facto* Clause:

> "The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute." 110 U. S., at 589–590.

In this case, not only was the change in the law procedural, it was ameliorative. It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law. Petitioner argues that the change in the law harmed him because the jury's recommendation of life imprisonment would not have been subject to review by the trial judge under the prior law. But it certainly cannot be said with assurance that, had his trial been conducted under the old statute, the jury would have returned a verdict of life.[7]

Hence, petitioner's speculation that the jury would have recommended life were the prior procedure in effect is not compelling. We must compare the two statutory procedures *in toto* to determine if the new may be fairly characterized as more onerous. Under the old procedure, the death penalty was "presumed" unless the jury, in its unbridled discretion, made a recommendation for mercy. The Florida Legislature enacted the new procedure specifically to provide the constitutional procedural protections required by *Furman,* thus

---

[7] For example, the jury's recommendation may have been affected by the fact that the members of the jury were not the final arbiters of life or death. They may have chosen leniency when they knew that that decision rested ultimately on the shoulders of the trial judge, but might not have followed the same course if their vote were final.

providing capital defendants with more, rather than less, judicial protection. The protections thus provided, which this Court upheld in *Proffitt*, are substantial. A separate hearing is held; the defendant is allowed to present any relevant mitigating evidence. The jury renders an advisory verdict based upon its perception of aggravating and mitigating factors in the case. The court makes the final determination, but may impose death only after making a written finding that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.

Finally, in what may be termed a tripartite review, the Florida Supreme Court is required to review each sentence of death. This required review, not present under the old procedure, is by no means perfunctory; as was noted in *Proffitt*, as of that time the Florida Supreme Court had vacated 8 of the 21 death sentences that it had reviewed to that date. 428 U. S., at 253.[8] Perhaps most importantly, the Florida Supreme Court has held that the following standard must be used to review a trial court's rejection of a jury's recommendation of life:

> "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so *clear and convincing that virtually no reasonable person could differ." Tedder* v. *State,* 322 So. 2d 908, 910 (1975) (emphasis added) (cited with approbation in *Proffitt* v. *Florida,* 428 U. S., at 249).

This crucial protection demonstrates that the new statute affords significantly more safeguards to the defendant than did the old. Death is not automatic, absent a jury recommendation of mercy, as it was under the old procedure. A jury recommendation of life may be overridden by the trial

---

[8] Since that time, the State informs us, the Florida Supreme Court has reversed nine death sentences, and affirmed eight. Brief for Respondent 18–19, n. 3; Respondent's Notice of Additional Authority.

judge only under the exacting standards of *Tedder*.[9] Hence, defendants are not significantly disadvantaged vis-à-vis the recommendation of life by the jury; on the other hand, unlike the old statute, a jury determination of death is not binding. Under the new statute, defendants have a second chance for life with the trial judge and a third, if necessary, with the Florida Supreme Court. No such protection was afforded by the old statute. Hence, viewing the totality of the procedural changes wrought by the new statute, we conclude that the new

---

[9] The fact that the trial judge imposed a death sentence after the jury had recommended life in this case in no way denigrates the procedural protections afforded by the new procedure. The judge did so in circumstances where there were obvious and substantial aggravating factors, and where there had been no significant mitigating factors adduced. To demonstrate that it was the nature of the crime, rather than the scope of the procedure, that resulted in the death sentence in this case, we set forth *in extenso* the conclusions of the trial court at the sentencing phase:

"There are sufficient and great aggravating circumstances which exist to justify the sentence of death.

"In concluding my findings I would like to point out that my 22 years of legal experience have been almost exclusively in the field of criminal law.

"The Judge of this Court has been a defense attorney of criminal cases, a prosecutor for eight and one half years and a Criminal Court Judge and a Circuit Judge—Felony Division for three and one half years.

"During this [*sic*] 22 years I have defended, prosecuted and held trial of almost every type of serious crime. During these years of legal experience I have never known of a more heinous, atrocious and cruel crime than this one.

"My experience with the sordid, tragic and violent side of life has not been confined to the Courtroom. During World War II, I was a United States Army Paratrooper and served overseas in ground combat. I have had friends blown to bits and have seen death and suffering in every conceivable form.

"I am not easily shocked or [a]ffected by tragedy or cruelty—but this murder of a helpless, defenseless and innocent child is the most cruel, atrocious and heinous crime I have eve[r] personally known of—and it is deserving of no sentence but death." App. 49.

statute did not work an onerous application of an *ex post facto* change in the law. Perhaps the ultimate proof of this fact is that this old statute was held to be violative of the United States Constitution in *Donaldson v. Sack*, 265 So. 2d 499 (Fla. 1972), while the new law was upheld by this Court in *Proffitt, supra*.

## B

Petitioner's second *ex post facto* claim is based on the contention that at the time he murdered his children there was no death penalty "in effect" in Florida. This is so, he contends, because the earlier statute enacted by the legislature was, after the time he acted, found by the Supreme Court of Florida to be invalid under our decision in *Furman v. Georgia,* 408 U. S. 238 (1972). Therefore, argues petitioner, there was no "valid" death penalty in effect in Florida as of the date of his actions. But this sophistic argument mocks the substance of the *Ex Post Facto* Clause. Whether or not the old statute would, in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

Petitioner's highly technical argument is at odds with the statement of this Court in *Chicot County Dist. v. Baxter State Bank,* 308 U. S. 371, 374 (1940):

> "The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. *Norton v. Shelby County,* 118 U. S. 425, 442; *Chicago, I. & L. Ry. Co.* v.

*Hackett,* 228 U. S. 559, 566. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored."

Here the existence of the statute served as an "operative fact" to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution.

## C

Petitioner's third *ex post facto* contention is based on the fact that the new Florida statute provides that anyone sentenced to life imprisonment must serve at least 25 years before becoming eligible for parole. The prior statute contained no such limitation. The Florida Supreme Court in *Lee* v. *State,* 294 So. 2d 305 (1974), found that this provision restricting parole could not constitutionally be applied to crimes committed prior to its effective date. Petitioner contends that nonetheless its enactment by the Florida Legislature amounts to an *ex post facto* law, and that because of this he may successfully challenge the death sentence imposed upon him.

Petitioner, of course, did not receive a life sentence, and so any added onus attaching to it as a result of the change in Florida law had no effect on him. In *Lindsey* v. *Washington,* 301 U. S. 397, 400–401 (1937), the Court stated:

"The effect of the new statute is to make mandatory what was before only the maximum sentence. Under it the prisoners may be held to confinement during the entire fifteen year period. Even if they are admitted to parole, to which they become eligible after the expiration of the terms fixed by the board, they remain subject

to its surveillance and the parole may, until the expiration of the fifteen years, be revoked at the discretion of the board or cancelled at the will of the governor. *It is true that petitioners might have been sentenced to fifteen years under the old statute. But the ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed.* The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. *Kring v. Missouri,* [107 U. S. 221,] 228–229; *In re Medley,* 134 U. S. 160, 171; *Thompson v. Utah,* 170 U. S. 343, 351. *It is for this reason that an increase in the possible penalty is ex post facto, Calder v. Bull,* 3 Dall. 386, 390; *Cummings v. Missouri,* [4 Wall. 277,] 326; *Malloy v. South Carolina,* 237 U. S. 180, 184, *regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier, State v. Callahan,* 109 La. 946; 33 So. 931; *State v. Smith,* 56 Ore. 21; 107 Pac. 980." (Emphasis added.)

Lifted from their context and read expansively, the emphasized portions of the quoted language would lend some support to petitioner's claim. But we think that consideration of the *Lindsey* language in the factual context in which that case was decided does not lead to the result sought by petitioner.

*Lindsey* came here from the Supreme Court of Washington on a claim that a change in the state law respecting the sentence to be imposed upon one convicted of the felony of grand larceny violated the *Ex Post Facto* Clause. At the time Lindsey committed the larceny, the law provided for a maximum sentence of 15 years, and a minimum sentence of not less than 6 months. At the time Lindsey was sentenced, the law had been changed to provide for a mandatory 15-year sentence. Even though under the new statute a convict could be ad-

mitted to parole at a time far short of the expiration of his mandatory sentence, the Court observed that even on parole he would remain "subject to the surveillance" of the parole board and that his parole itself was subject to revocation.

Lindsey, then, had received a sentence under the new law which was within permissible bounds under the old law, albeit at the outer limits of those bounds. But under the new law it was the *only* sentence he could have received, while under the old law the sentencing judge could in his discretion have imposed a much shorter sentence. In contrast to the petitioner here, Lindsey was not complaining in the abstract about some change in the law, which as events proved, would have no applicability to his case. His complaint was that the new law totally eliminated any sentence of less than 15 years once he was convicted of larceny, and thereby assured that he would receive what was only the discretionary maximum sentence under the old law.

We think the excerpted language from *Lindsey* must be read in the light of these facts to mean that one is not barred from challenging a change in the penal code on *ex post facto* grounds simply because the sentence he received under the new law was not more onerous than that which he might have received under the old. It is one thing to find an *ex post facto* violation where under the new law a defendant *must* receive a sentence which was under the old law only the maximum in a discretionary spectrum of length; it would be quite another to do so in a case, such as this, where the change has had no effect on the defendant in the proceedings of which he complains.

Petitioner here can make no claim comparable to Lindsey's. Under the new law, both life imprisonment and death remain as possible alternative sentences. Only if we were to read the excerpted portion of the quoted language from *Lindsey* to confer standing on the defendant to complain of an added burden newly attached to a sentence which was never imposed on him would that language assist him. But we hold that petitioner,

having been sentenced to death, may not complain of burdens attached to the life sentence under the new law which may not have attached to it under the old.

## D

After our *Furman* decision and its own decision in *Donaldson* v. *Sack,* the Florida Supreme Court resentenced all prisoners under sentence of death pursuant to the old statute to life imprisonment. *Anderson* v. *State,* 267 So. 2d 8 (1972); *In re Baker,* 267 So. 2d 331 (1972). Petitioner argues that since his crimes were committed before our decision in *Furman,* the imposition of the death sentence upon him pursuant to the new statute which was in effect at the time of his trial denies him equal protection of the laws.

But petitioner is simply not similarly situated to those whose sentences were commuted. He was neither tried nor sentenced prior to *Furman,* as were they, and the only effect of the former statute was to provide sufficient warning of the gravity Florida attached to first-degree murder so as to make the application of this new statute to him consistent with the *Ex Post Facto* Clause of the United States Constitution. Florida obviously had to draw the line at some point between those whose cases had progressed sufficiently far in the legal process as to be governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision, and those whose cases involved acts which could properly subject them to punishment under the new statute. There is nothing irrational about Florida's decision to relegate petitioner to the latter class, since the new statute was in effect at the time of his trial and sentence.

## III

There was, understandably, extensive pretrial publicity concerning several aspects of this case. We accept petitioner's assertion, Brief for Petitioner 38–48, that there was substantial

media coverage, including a number of television and radio stories regarding the various aspects of the case.

In *Murphy* v. *Florida,* 421 U. S. 794 (1975), we reviewed a trial in which many jurors had heard of the defendant through extensive news coverage. Characterizing our previous cases in which we had overturned a state-court conviction on these grounds as involving "a trial atmosphere that had been utterly corrupted by press coverage," *id.,* at 798, we recognized:

> "Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
>
> " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Id.,* at 799–800, quoting from *Irvin* v. *Dowd,* 366 U. S. 717, 723 (1961).

We concluded that the petitioner in *Murphy* had failed to show that the trial setting was inherently prejudicial or that the jury selection process permitted an inference of actual prejudice. 421 U. S., at 803.

The Florida Supreme Court in this case noted that 78 prospective jurors were interviewed, and that petitioner exercised only 27 of his 32 peremptory challenges. Specifically referring to our decision in *Murphy,* that court concluded:

> "[W]e find from the record that the trial judge did everything possible to insure an impartial trial for the defendant. The jurors, carefully and extensively examined by defense counsel to determine that they could be fair and impartial, were sequestered and [a] comprehensive gag order was placed on all participants of the trial.
>
> .        .        .        .        .
>
> "Appellant has failed to show that he did not receive

a fair and impartial trial, that the setting of his trial was inherently prejudicial." 328 So. 2d, at 439–440.

Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the *voir dire* examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy,* extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy* v. *Florida, supra,* at 798. One who is reasonably suspected of murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra,* the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity. The judgment of the Supreme Court of Florida is therefore

*Affirmed.*

Mr. Chief Justice Burger, concurring.

I join the opinion of the Court. A crucial factor in this case, for me, is that, as the Court's opinion recites, when petitioner committed the crime, a Florida statute permitted the death penalty for the offense. Petitioner was at least constructively on notice that this penalty might indeed follow his actions. During the time which elapsed between the commission of the offense and the trial, the statute was

changed to provide different procedures for determining whether death was an appropriate punishment. But these new procedures, taken as a whole, were, if anything, more favorable to the petitioner; consequently the change cannot be read otherwise than as the Court's opinion suggests.

MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL, dissenting.

Adhering to our views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227, 231 (1976), we would vacate the death sentence in this case.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Only a few simple facts are relevant to the question of law presented by this case.[1] At the time of petitioner's offense, there was no constitutional procedure for imposing the death penalty in Florida. Several months after his offense, Florida enacted the death penalty statute that was upheld in *Proffitt* v. *Florida,* 428 U. S. 242. Before this statute was passed, as a matter of Florida law, the crime committed by petitioner was not a capital offense.[2] It is undisputed, therefore, that a law passed after the offense is the source of Florida's power to put petitioner to death.

---

[1] The atrocious character of this indi-:idual's crimes, which the Court recounts in such detail, is of course no more relevant to the legal issue than the fact that 10 of the 12 jurors who heard all of the evidence voted to spare his life.

[2] In response to this Court's decision in *Furman* v. *Georgia,* 408 U. S. 238, the Florida Supreme Court held that the Florida death penalty had been abolished, that even the category of "capital offenses" had ceased to exist, and that there was no possible procedure under existing Florida law for imposing the penalty. *Donaldson* v. *Sack,* 265 So. 2d 499 (1972); *State* v. *Whalen,* 269 So. 2d 678 (1972). Following these decisions, therefore, the crime committed by petitioner was not a capital offense.

The Court holds that Florida may apply this law to petitioner without violating the *Ex Post Facto* Clause.[3]  In its view, the unconstitutional law which was on the Florida statute books at the time of the offense "clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers." *Ante,* at 297.  The Court concludes that the "fair warning" provided by the invalid statute "was sufficient compliance with the *ex post facto* provision of the United States Constitution." *Ante,* at 298.[4]

This conclusion represents a clear departure from the test the Court has applied in past cases construing the *Ex Post Facto* Clause.  That test was stated in *Lindsey* v. *Washington,* 301 U. S. 397, 401, in language that might have been written with the present case in mind:

> "The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." [5]

Applying that test in *Lindsey,* the Court held that even though

---

[3] Article I, § 10, provides that "[n]o State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ."  There is a separate prohibition against *ex post facto* laws in Art. I, § 9, which applies to Congress.

[4] In support of this conclusion, the Court cites not a single case involving the *Ex Post Facto* Clause.  Instead, it relies solely on a case which held that a decision of this Court could not serve as a basis for a retroactive attack on a final judgment in a civil case.  *Chicot County Dist.* v. *Baxter State Bank,* 308 U. S. 371.

[5] Cf. *Kring* v. *Missouri,* 107 U. S. 221, in which the Court reviewed a number of state cases involving *ex post facto* legislation and explicitly endorsed this "excellent observation" by Judge Denio of the New York Court of Appeals:

" 'No one can be criminally punished in this country, *except according to a law prescribed for his government by the sovereign authority, before the imputed offence was committed, and which existed as a law at that time.'* " *Id.,* at 230–231, quoting *Hartung* v. *People,* 22 N. Y. 95, 104 (1860) (emphasis in original).

the statute in effect at the time of the crime authorized a sentence of 15 years in the discretion of the trial judge, that sentence could not be imposed pursuant to a new mandatory sentencing statute. Notwithstanding the defendant's "fair warning" of the possible 15-year sentence, the Court held that the change in the standard of punishment could not be retroactively applied to him.[6] The change was invalid sim-

---

[6] This language from Mr. Justice Stone's opinion is, I believe, plainly applicable to this case:

"It is true that petitioners might have been sentenced to fifteen years under the old statute. But the *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. *Kring* v. *Missouri, supra,* 228–229; *In re Medley,* 134 U. S. 160, 171; *Thompson* v. *Utah,* 170 U. S. 343, 351. It is for this reason that an increase in the possible penalty is *ex post facto, Calder* v. *Bull,* 3 Dall. 386, 390; *Cummings* v. *Missouri,* [4 Wall. 277,] 326; *Malloy* v. *South Carolina,* 237 U. S. 180, 184, regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier, *State* v. *Callahan,* 109 La. 946; 33 So. 931; *State* v. *Smith,* 56 Ore. 21; 107 Pac. 980.

"Removal of the possibility of a sentence of less than fifteen years, at the end of which petitioners would be freed from further confinement and the tutelage of a parole revocable at will, operates to their detriment in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old. It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change. *Marion* v. *State,* 16 Neb. 349; 20 N. W. 289. Yet this is only a more striking instance of the detriment which ensues from the revision of a statute providing for a maximum and minimum punishment by making the maximum compulsory. We need not inquire whether this is technically an increase in the punishment annexed to the crime, see *Calder* v. *Bull, supra,* 390. It is plainly to the substantial disadvantage of petitioners . . . ." 301 U. S., at 401–402.

In this case, it is also plainly to the substantial disadvantage of the petitioner to be sentenced to death pursuant to a statute that was enacted

ply because the new standard increased the probability of a severe sentence. In the case before us, the new standard created the possibility of a death sentence that could not have been lawfully imposed when the offense was committed. A more dramatically different standard of punishment is difficult to envision.

We should adhere to the *Lindsey* test. Fair warning cannot be the touchstone, for two reasons. First, "fair warning" does not provide a workable test for deciding particular cases. Second, as Mr. Justice Harlan has explained,[7] fair notice is not the only important value underlying the constitutional prohibition; the *Ex Post Facto* Clause also provides a basic protection against improperly motivated or capricious legislation.[8] It ensures that the sovereign will govern impar-

---

after his offense was committed, when he could not have been validly sentenced to death under the law in effect at the time of the offense.

[7] Mr. Justice Harlan understood the *Ex Post Facto* Clause as serving a purpose beyond ensuring that fair notice be given of the legal consequences of an individual's actions. He stated:

"Aside from problems of warning and specific intent, the policy of the prohibition against *ex post facto* legislation would seem to rest on the apprehension that the legislature, in imposing penalties on past conduct, even though the conduct could properly have been made criminal and even though the defendant who engaged in that conduct in the past believed he was doing wrong (as for instance when the penalty is increased retroactively on an existing crime), may be acting with a purpose not to prevent dangerous conduct generally but to impose by legislation a penalty against specific persons or classes of persons." *James* v. *United States*, 366 U. S. 213, 247 n. 3 (separate opinion).

[8] Unlike the procedural guarantees in the Bill of Rights which originally were applicable only to the Federal Government, the *Ex Post Facto* Clause has always applied to the States. Mr. Justice Chase, writing just a few years after the Constitution was adopted, stated that the Clause was probably a result of the *ex post facto* laws and bills of attainder passed in England. "With very few exceptions, the advocates of *such* laws were stimulated by ambition, or personal resentment, and vindictive malice. To prevent such, and similar, acts of violence and injustice, . . . the Federal and State Legislatures, were prohibited from passing any bill of

tially and that it will be perceived as doing so. The Court's "fair warning" test, if it extends beyond this case, would allow government action that is just the opposite of impartial. If that be so, the "fair warning" rationale will defeat the very purpose of the Clause.

By what standard is the fairness of the warning contained in an unconstitutional statute to be judged? Is an itinerant, who may not have the slightest notion of what Florida's statute books contain, to be judged differently from a local lawyer? The assumption that the former has "fair warning" can only rest on the somewhat unrealistic presumption that everyone is deemed to know the law. But it is not words in statute books that constitute the law. If citizens are bound to know the law, "they [are] bound to know it as we have expounded it." *Kring* v. *Missouri,* 107 U. S. 221, 235. A consistent application of that presumption would require the conclusion that neither the lawyer nor the itinerant had fair warning because both must also be presumed to know that the old Florida statute was a nullity. The Court's test cannot fairly be applied on the basis of a particular individual's actual knowledge of the law; if applied on the basis of a presumed knowledge of the law, it requires that this death sentence be vacated.

---

*attainder;* or any *ex post facto law." Calder* v. *Bull,* 3 Dall. 386, 389. It is an important indication of the thought of the times that Mr. Justice Chase believed that the Clause did no more than state an inherent rule of government:

"This fundamental principle flows from the very nature of our free Republican governments, that no man should be compelled to do what the laws do not require; nor to refrain from acts which the laws permit. . . . The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them . . . . To maintain that our Federal, or State, Legislature possesses such powers, if they had not been expressly restrained; would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments." *Id.,* at 388–389 (italics omitted).

As applied to pre-*Furman* death penalty statutes, the Court's test is dramatically inadequate. The Court makes the assumption that the "existence on the statute books" of the pre-*Furman* statute provided "fair warning" to petitioner "of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder." *Ante,* at 297, 298. On the contrary, capital punishment at the time of *Furman* had "for all practical purposes run its course." *Furman* v. *Georgia,* 408 U. S. 238, 313 (WHITE, J., concurring). The death penalty at that time was "freakishly imposed" and "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Id.,* at 310, 309 (STEWART, J., concurring). The possibility of such capricious punishment is not "fair warning," under any meaningful use of those words.

If the Court's rationale is applicable to all cases in which a State replaces an unconstitutional death penalty statute with a subsequent statute, it is dramatically at odds with the common understanding of the meaning of the Clause. That understanding was most plainly revealed by the nationwide response to this Court's invalidation of the death penalty in *Furman* v. *Georgia, supra.* Of the hundreds of prisoners on death row at the time of that decision, none was resentenced to death. Each of those persons, at the time of his offense, had precisely the same "fair warning" as this petitioner. But our state courts and state legislatures uniformly acted on the assumption that none of them could be executed pursuant to a subsequently enacted statute. Under the "fair warning" rationale the Court adopts today, there was, and is, no such constitutional barrier.

If I am correct that the *Ex Post Facto* Clause was intended as a barrier to capricious government action, today's holding is actually perverse. For when human life is at stake, the need to prevent capricious punishment is greatest, as our decisions in *Furman* and *Proffitt* establish. Cf. *Skinner* v. *Oklahoma ex*

*rel. Williamson,* 316 U. S. 535.   Yet the Court's holding may lead to results which are intolerably arbitrary.   For example, the trial in *Miller* v. *State,* 332 So. 2d 65 (Fla. 1976), was delayed by the defendant's incompetence to stand trial.   By the time his capacity was restored, Florida had enacted its new death penalty statute.   Had it not been for his fortuitous illness, defendant would have been tried promptly and escaped the death penalty.   Because of a delay over which he had no control, the enactment of an *ex post facto* statute was held to entitle the State to put him to death.   The capricious consequence is particularly grotesque because Miller may well have been advised before trial that this Court's decision in *Furman* had removed the possibility of a death sentence.[9]

Because a logical application of the Court's "fair warning" rationale would lead to such manifestly intolerable results, [10]

<hr/>

[9] A comment by Judge Learned Hand on the unfairness of extending a statute of limitations after it had run has even greater force if applied to this kind of situation:

"The question turns upon how much violence is done to our instinctive feelings of justice and fair play.   For the state to assure a man that he has become safe from its pursuit, and thereafter to withdraw its assurance, seems to most of us unfair and dishonest." *Falter* v. *United States,* 23 F. 2d 420, 425–426 (CA2 1928).

[10] Perhaps this is an area in which an example is worth more than argument.   In *Grayned* v. *City of Rockford,* 408 U. S. 104, demonstrators were convicted under an ordinance which prohibited picketing within 150 feet of a school.   This Court affirmed convictions under an anti-noise ordinance but reversed the convictions under the anti-picketing ordinance.   The reason for reversal was that the ordinance exempted peaceful picketing of any school involved in a labor dispute; it was therefore held to be invalid because it was not neutral as to content.   See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92.   But in the meantime, the ordinance had been amended in 1971 to delete the labor exemption, thus removing the First Amendment problem, 408 U. S., at 107 n. 2.   As I understand today's decision, these demonstrators could now be convicted of violating the 1971 ordinance on the basis of their actions in 1969, since they were on fair notice that the State intended to prohibit their conduct.   At least in *Grayned* there was no reason to think that the 1971 ordinance was

I assume that this case will ultimately be regarded as nothing more than an archaic gargoyle. It is nevertheless distressing to witness such a demeaning construction of a majestic bulwark in the framework of our Constitution.

I respectfully dissent.

---

passed with retroactive application in mind—I am sure that before today no one would have considered such an application constitutional—but the potential for this kind of legislative (and prosecutorial) abuse is created by the Court's holding. It was precisely this potential that the Framers wished to avoid.

Indeed, the Court's holding today seems inconsistent with its holding in *Grayned.* For in *Grayned,* the Court agreed with a concession that the 1971 amendment " 'has, of course, no effect on Appellant's personal situation,' " and went on to say that "[n]essarily, we must consider the facial constitutionality of the ordinance in effect when appellant was arrested and convicted." 408 U. S., at 107 n. 2. Under today's holding, it is difficult to see why the 1971 amendment could not simply have been applied *ex post facto* to cure the defect in the original statute.