Albert Lewis CAREY, Jr., Petitioner,

v.

Samuel P. GARRISON, Warden, Central Prison, Raleigh, North Carolina, and the State of North Carolina, Respondents.

No. C–C–77–249.

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 13, 1978.

**486**

No appearance for petitioner.

Richard N. League, Asst. Atty. Gen., Dept. of Justice, Raleigh, N. C., for respondents.

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

McMILLAN, District Judge.

As of 1969, North Carolina General Statutes § 14–17, defined and provided punishment for murder as follows:

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death: Provided, *if* at the time of rendering its verdict in open court, *the jury shall so recommend*, the *punishment shall be imprisonment for life* in the State's prison, and the court shall so instruct the jury. . . ." (Emphasis added.)

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court held that the imposition of the death penalty in Georgia and in Texas was unconstitutional. The decision was widely read to be based upon the discriminatory and freakish or capricious or sporadic aspects and results of the jury's discretion in such cases which in practice bore more heavily upon the black and the poor; a mandatory death penalty for first degree crimes, it was suggested, might pass constitutional muster.

On January 18, 1973, the Supreme Court of North Carolina, in *State v. Waddell*, 282

N.C. 431, 194 S.E.2d 19 (1973), construed N.C.G.S. § 14–17 in light of *Furman v. Georgia*. The court held invalid the proviso of N.C.G.S. § 14–17 which allowed the jury to recommend life imprisonment instead of death. However, the court ruled that the discretionary proviso was separable from the rest of the statute, and upheld the death penalty as mandatory punishment for capital crimes in North Carolina. This judicial amendment to the statute was held not retroactive because if retroactive it would be an *ex post facto* law as to previous crimes; therefore the statute as amended could not constitutionally apply to any offense committed before January 18, 1973. In effect, it commuted from death to life imprisonment the sentences of all persons convicted of first degree murder before January 18, 1973.

On June 19, 1973, Albert Lewis Carey, Jr., the petitioner, and some others took part in an armed robbery and murder at an Esso service station on Trade Street in Charlotte, North Carolina. Carey was prosecuted in Mecklenburg County Superior Court for first degree murder and conspiracy to commit armed robbery. He was tried on both charges and on December 11, 1973, was sentenced to ten years in prison on the conspiracy charge and, as required by the Supreme Court's ruling in *State v. Waddell*, 282 N.C. 431, 194 S.E.2d 19 (1973), was sentenced to death on the murder charge. He appealed to the Supreme Court of North Carolina.

While Carey's appeal was pending, the North Carolina General Assembly revised N.C.G.S. § 14–17 so as to eliminate all the language in the text quoted above after the word "death." That act became effective on April 8, 1974. The legislation contained the following proviso:

"In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment."

North Carolina Session Laws 1973, c. 1201, s. 7. (The statute was further amended in 1977 in ways not relevant here. North Carolina Session Laws 1977, c. 406, s. 6.)

Carey appealed his December 11, 1973 conviction and, on grounds not relevant to this case, obtained a new trial, *State v. Carey*, 285 N.C. 509, 206 S.E.2d 222 (1974). He was re-tried and again convicted of murder and conspiracy and was again sentenced to ten years in prison on the conspiracy charge and to death on the murder charge. The convictions were affirmed on November 7, 1975, *State v. Carey*, 288 N.C. 254, 218 S.E.2d 387 (1975). He applied for *certiorari* to the Supreme Court of the United States. *Certiorari* was granted.

On July 2 and July 6, 1976, the Supreme Court decided *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Carey v. North Carolina*, 428 U.S. 904, 96 S.Ct. 3209, 49 L.Ed.2d 1209 (1976). *Woodson* held that the modified North Carolina statute which eliminated any discretion on the part of the jury in first degree cases was invalid because of its procrustean and arbitrary treatment of all convicted persons with exactly the same punishment—death—and provided no standards to guide the jury in determining which murderers should live. In *Carey's* case, upon the authority of *Woodson*, the judgment was vacated insofar as the death penalty was concerned, and the case was remanded to the Supreme Court of North Carolina for further proceedings. (The facts in *Woodson* involved a conviction under N.C.G.S. § 14–17 (1974), but the reasoning was equally applicable to N.C.G.S. § 14–17 (1969) as construed in *Waddell.*)

On August 18, 1976, the North Carolina Supreme Court decided *State v. Davis*, 290 N.C. 511, 227 S.E.2d 97 (1976). It was a prosecution for a murder which occurred on December 28, 1973, and which, like Carey's crime, followed the *Waddell* decision of January 18, 1973, but preceded the enactment and effective date of the 1974 amendments to N.C.G.S. § 14–17. The North Carolina court in *Davis* said:

"Both common sense and rudimentary justice demand that the maximum permissible sentence of life imprisonment now be imposed upon a person convicted of first degree murder or rape committed between *Waddell* and the enactment of Ch. 1201 which rewrote G.S. 14–17. This interpretation is bolstered by the General Assembly's enactment of Ch. 1201, § 7, N.C. Sess. Laws (1973, 2d Session 1974), effective 8 April 1974, which specifically provided: 'In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment.' The policy underlying this statute is by analogy as applicable to the invalidation of the mandatory death penalty declared by the *Waddell* interpretation as it is to the invalidation of the mandatory death penalty law enacted by the General Assembly, both of which were invalidated by *Woodson*. This statute manifests the General Assembly's intent to eliminate any possibility that, because of the action of the Supreme Court, the punishment for a crime for which it had mandated the death penalty would be left in limbo between its sessions.

"The contention that, with reference to first degree murder (or a rape) committed prior to the 1975 Act, the only permissible punishment is a maximum of ten years' imprisonment under G.S. 14–2 (1969) is unrealistic. It is noted that the punishment for *second* degree murder is now imprisonment for life or a term of years, G.S. 14–17 (Cum.Supp.1975), and for manslaughter, up to twenty years, G.S. 14–18 (1969). Murder in the first degree is obviously the most serious of the felonious homicides. (Similarly, the punishment for second degree rape is imprisonment for life or a term of years, G.S. 14–21 (Cum.Supp.1975), and for assault with intent to commit rape, impris-

onment up to fifteen years, G.S. 14–22 (1969).)"

290 N.C. at 548, 227 S.E.2d at 119.

The Supreme Court of North Carolina on September 1, 1976, further remanded Carey's case to the Mecklenburg County Superior Court with instructions to enter a judgment of conviction and a sentence of life imprisonment on the murder charge. The re-sentencing, in accordance with that mandate of the North Carolina Supreme Court, took place without a hearing on September 13, 1976.

Carey, having exhausted state remedies by appeals, filed this petition for habeas corpus, claiming:

1. That his re-sentencing in 1976 violated the due process clause because it was an *ex post facto* application by the court of N.C.G.S. § 14–17 (1974), which was passed after the crime for which he was convicted;

2. That he was unconstitutionally denied the right to be present at his re-sentencing; and

3. That he is being denied credit for time served prior to trial and during the pendency of his appeals.

## I.

■ Petitioner's first claim, his due process contention, is imaginative but without merit. He claims that for crimes of murder committed after January 18, 1973, the date of the *Waddell* decision, and before April 8, 1974, the effective date of the revised version of N.C.G.S. § 14–17, the only permissible statutory penalty was that provided in N.C.G.S. § 14–2 for unclassified felonies—a maximum term of ten years' imprisonment. Petitioner contends that his sentence of life imprisonment thus amounts to an *ex post facto* application of N.C.G.S. § 14–17 (1974). He contends that *Waddell* irrevocably invalidated the "jury option" provision of § 14–17 and that *Woodson* invalidated the death penalty provision. In his view *Waddell* subtracted half the statute and *Woodson* took away the remainder, leaving nothing at all.

Petitioner is mistaken. *Waddell* construed a statute which contained provision for both death and life sentences. It was the statute *as construed* in *Waddell* which was invalidated by *Woodson*, not the statute as originally written. The two decisions operate not additively but successively. Thus the effect of *Woodson* was to return the situation to its post-*Furman*, pre-*Waddell* status. *State v. Davis*, 290 N.C. 511, 547, 227 S.E.2d 97 (1976); *cf. Clark's Charlotte, Inc. v. Hunter*, 261 N.C. 222, 233, 134 S.E.2d 364 (1964).

It is not possible to say with certainty how the North Carolina Supreme Court would have construed § 14–17 (1969) at the time of the *Waddell* decision in January, 1973, if it had foreseen what the Supreme Court was going to do three and one-half years later in *Woodson*. Certainly, the court in *Waddell* had the option of construing § 14–17 (1969) to provide for a mandatory sentence of life imprisonment as well as the option of construing it to require a mandatory death sentence, as it in fact did. The rejection of the former construction was based on the historical preference for the death penalty shown by the North Carolina legislature.

However, it does seem that the guiding principle of the *Waddell* decision was to construe § 14–17 (1969) to provide for the maximum penalty constitutionally permissible. There is nothing which offends the due process or *ex post facto* clauses in saying now, in light of *both Furman* and *Woodson*, that the only constitutional penalty for first degree murder under § 14–17 (1969) was life imprisonment. Petitioner's re-sentencing was not an *ex post facto* application of § 14–17 (1974); it was instead a judgment entered according to the only constitutional interpretation of § 14–17 (1969), the statute in force at the time of his conviction. *State v. Davis, supra*, 290 N.C. at 547–48, 227 S.E.2d 97.

Even if petitioner is correct in arguing that § 14–17 (1969) became totally invalid as a result of the *Furman-Waddell-Woodson* series, and that his sentencing therefore amounted to an *ex post facto* application of § 14–17 (1974), he has not established a violation of his rights of constitutional pro-

portions. Before the time of his June 19, 1973, offense, North Carolina had given notice, in the 1969 version of N.C.G.S. § 14–17, that it intended to exact the maximum possible penalty for first degree murder. In the circumstances of this case no more is required by the due process and *ex post facto* clauses. *Dobbert v. Florida*, 432 U.S. 282, 297–98, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

## II.

■ The disposition of petitioner's second claim follows from the foregoing. Under N.C.G.S. § 14–17, the only sentence which could be imposed on petitioner was life imprisonment. Under N.C.G.S. § 15–197 petitioner, as a life termer, was not eligible for probation or for a suspended sentence. Therefore, there was no possible prejudice resulting from the lack of a hearing. Petitioner's second claim will therefore be dismissed.

## III.

Petitioner fares better on this third claim. He began service of his sentence for murder on December 11, 1973, immediately following his first conviction. The prison records show that his parole eligibility date is December 11, 1983. This is in accord with N.C.G.S. § 148–58 (1955), which prescribes a ten-year parole eligibility date for persons serving life sentences. It thus appears that petitioner is now receiving credit for purposes of *parole* eligibility and other privileges for all time served while he prosecuted his various *appeals* related to the *murder* conviction. *See Wilson v. North Carolina*, 438 F.2d 284 (4th Cir. 1971).

However, the record is less clear concerning the credits petitioner has received on his ten-year sentence for conspiracy to commit armed robbery. The judgment and commitment entered after his second trial in 1974 expressly provide for credit on the conspiracy sentence for all time served from the date of arrest on July 10, 1973, until the date of the judgment, December 19, 1974. Prison records related to the conspiracy conviction show a parole eligibility

date of December 11, 1983, but they do not show a date on which his sentence is deemed to have begun. Whether he is in fact receiving credit for time spent on *appeal* from December 19, 1974, until October 7, 1975, is not apparent from any of the documents now before the court. Nevertheless, the question of credits due against the conspiracy sentence is not presented by this petition. Petitioner speaks only of his sentence for life imprisonment, and it does not appear that he has ever raised in the North Carolina courts any specific question concerning the credits applicable to the *conspiracy* sentence. Accordingly, the court expresses no further view on his entitlement to such credits.

■ The only matter left for decision is whether petitioner is entitled to credit on his life sentence, for purposes of parole eligibility and other privileges, for time spent in custody *from the date of his arrest on July 10, 1973, until December 11, 1973.* Petitioner's right to receive credit for such purposes is clearly set out in N.C.G.S. § 15–196.3, which provides:

> "Time creditable under this section [including time for pre-trial custody as set out in § 196.1] . . ., irrespective of sentence, shall reduce the time required to attain privileges made available to inmates in the custody of the State Department of Correction which are dependent, in whole or in part, upon the passage of a specific length of time in custody, including parole consideration by the State Board of Paroles."

Petitioner's right to receive credit for pretrial incarceration in determining his parole eligibility date under N.C.G.S. § 148–58 (1955) is also constitutionally protected. *Vickers v. Haynes*, 539 F.2d 1005 (4th Cir. 1975); *see Durkin v. Davis*, 538 F.2d 1037, 1039 (4th Cir. 1976).

The credit petitioner seeks is for time actually spent in jail. It cannot be disputed that this time constitutes "punishment," as has sometimes been denied in cases involving credit for time spent on probation or parole. *See, e. g., Hall v. Bostic*, 529 F.2d

990 (4th Cir. 1975), *rev'g* 391 F.Supp. 1297 (W.D.N.C.1974) (and cases noted therein).

Respondents' reliance on *McGinnis v. Royster*, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973), is misplaced. *McGinnis* involved a claim of entitlement to "good time" credits accumulated during pretrial incarceration and before entry into the state's prison system. The Court held that it did not offend the equal protection clause for the state to deny prisoners "good time" credits for such pre-trial custody while allowing credits up to the full period of ultimate imprisonment for persons who were released on bail prior to trial and sentencing. Significantly, the state had *not* denied pre-trial custody credit for the purpose of reducing the length of the minimum and maximum sentence imposed. The question in *McGinnis* thus involved only "good time" or "gain time" credits, matters which are dependent on observation of the prisoner's behavior while in state custody; it did not involve what is commonly referred to as "jail time." 410 U.S. at 265–66, 93 S.Ct. 1055; see *Durkin v. Davis, supra* at 1039 n.2. In the present case petitioner's earliest parole eligibility date is fixed by statute and is dependent entirely on the *passage of time in custody.* N.C.G.S. § 148–58 (1955). In computing his parole eligibility date, therefore, all "jail time" must be credited.

Whether treated as a petition for habeas corpus relief or as a request for injunctive relief under 42 U.S.C. § 1983, *see Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), petitioner's claim to credit for pre-trial custody in determining eligibility for privileges *other than parole* must be granted.

It appears from the respondents' answer that the sole reason petitioner was not given the statutory credit for his pre-trial incarceration was the fact that he had been sentenced to death. Respondents have not contended that persons originally sentenced to life imprisonment are not entitled to receive and do not receive the credits provided in N.C.G.S. § 15–196.3. To treat petitioner differently because he was initially, and unconstitutionally, sentenced to death is either an oversight or a freakish and arbitrary action.

Insofar as petitioner's eligibility for privileges such as "honor grade" status may depend in part upon the mere passage of time in custody, all "jail time" prior to his first conviction must also be credited. This is not to say that he must automatically become eligible for any of these privileges, but only that petitioner's pre-trial custody must be counted in determining whether he has satisfied any minimum "waiting period" before such privileges may be obtained.

IT IS THEREFORE ORDERED:

1. The application for writ of habeas corpus is denied and the petition is dismissed as to all claims except the claim of entitlement to credit for pre-trial custody from July 10, 1973, until December 11, 1973.

2. On petitioner's claim for credit for pre-trial custody, the application for writ of habeas corpus is granted. Respondents shall immediately correct petitioner's records and take all other steps necessary to reflect his entitlement to credit for the period spent in custody from July 10, 1973, until December 11, 1973.

3. Respondents may also wish to take a second look at petitioner's records concerning the computation of credits due on his conspiracy sentence.

4. Insofar as this order requires credit to be given toward eligibility for privileges *other than parole* it shall be treated as an injunction under 42 U.S.C. § 1983 binding upon respondent Garrison and the custodians of petitioner's records in the North Carolina Department of Correction.

5. The respondents shall inform the court of their compliance with paragraph 2 of this order by July 1, 1978.

Petitioner is advised that he may appeal from the dismissal of his claims in paragraph 1 of this order by forwarding a written notice of appeal to the Clerk of United States District Court, Post Office Box 1266, Charlotte, North Carolina 28231. Said *written* notice of appeal must be *received* by the Clerk within thirty (30) days from the date of entry of this final order, and

may be filed without prepayment of costs or giving of security therefor. The court declines to issue a certificate of probable cause.