Howard L. BASHOR,
Petitioner-Appellant,

v.

Henry RISLEY, Warden of Montana State Prison; and Michael Greely, Attorney General for the State of Montana, Respondents-Appellees.

No. 82–3293.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 1983.

Decided Feb. 7, 1984.

Barbara Harbinson, Oakland, Cal., for petitioner-appellant.

Dorothy McCarter, Helena, Mont., for respondents-appellees.

Before FLETCHER and ALARCON, Circuit Judges, and WATERS *, District Judge.

ALARCON, Circuit Judge:

Appellant Howard L. Bashor (Bashor), a Montana prisoner, petitioned for a writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254. The district court, 539 F.Supp. 259, denied the petition. Bashor appeals. We affirm.

FACTS

Appellant Bashor was convicted of deliberate homicide following a jury trial in a Montana state court. It is undisputed that James Hurley died of a gunshot wound inflicted by the appellant on December 3, 1977 in Kevin, Montana. There are differing versions of the events that led to Hurley's death.

The state presented evidence at trial that on the evening of December 2, 1977, Hurley, Marian Irgens, Duane Enneberg, and Jeanette Frost visited Bert's Bar in Kevin. During the evening, Irgens twice noticed Bashor's car being driven down the road adjacent to the bar. At approximately 1:30 a.m. on the morning of December 3, the group decided to leave the bar. As they

* Hon. Laughlin E. Waters, United States District Judge for the Central District of California, sitting by designation.

left, Bashor's vehicle was observed parked a short distance away from the bar with its headlights on. Bashor's friend, William Schaeffer, was standing in front of the vehicle. Schaeffer shouted at the group. Hurley and Enneberg approached Bashor's vehicle. Schaeffer confronted Enneberg in front of the vehicle. Hurley proceeded toward the driver's window. Bashor was seated in the driver's seat. Within seconds, a shot was heard and Hurley walked away from the vehicle saying, "I've had it." He died shortly thereafter.

Bashor testified that, upon arriving at Bert's Bar, he noticed Hurley's vehicle parked outside the bar. He decided not to go inside until Hurley and his friends had left. Schaeffer was sitting in the passenger's seat of Bashor's vehicle.

Bashor said Hurley left the bar and entered his vehicle. Thereafter, Hurley and Duane Enneberg left Hurley's vehicle and approached Bashor's vehicle. Bashor rolled down his window and told Hurley to go away. Hurley grabbed Bashor by the throat and one arm in an attempt to force Bashor out of the vehicle.

Bashor's left eye had been operated on to remove a cataract and implant a plastic lens. Bashor feared that any blow to his head would dislocate the lens, permanently damaging his eye. Bashor reached for his pistol, which was in a compartment between the front seats of the vehicle. The struggle continued until the gun went off.

After being picked up by the police, *Schaeffer* underwent a polygraph examination. His answers were to the effect that Hurley had been the aggressor in the altercation. The operator of the polygraph stated in a deposition that he was satisfied that Schaeffer's answers were truthful. The state filed a motion *in limine* seeking to prohibit Bashor from entering the results of Schaeffer's polygraph examination into evidence. The motion was granted.

Bashor moved for a change of venue based on inflammatory pretrial publicity and general bias against him in Toole County, Montana. The judge reserved his ruling on the motion pending the outcome of the voir dire examination of the jury. At the conclusion of voir dire, the judge denied Bashor's motion.

The jury returned a verdict of guilty of deliberate homicide. Bashor was sentenced to Montana State Prison for a term of thirty years, with ten years suspended. On appeal, the Montana Supreme Court affirmed Bashor's conviction. *State v. Bashor*, 614 P.2d 470 (Mont.1980) (3–2 decision). On July 17, 1981, Bashor filed a petition for post-conviction relief in the Montana Supreme Court, which was denied on October 19, 1981.

Having exhausted his state remedies, Bashor filed a petition for a writ of habeas corpus in the United States District Court. Bashor was granted leave to proceed *in forma pauperis*. The district court denied Bashor's motion for appointment of counsel. The district court ordered an expansion of the record to include a copy of the jury instructions. Bashor's petition was denied.

ANALYSIS

"State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). If the petitioner has a proper claim then "even a single federal judge may overturn the judgment of the highest court of a State insofar as it deals with the application of the United States Constitution or laws to the facts in question." *Sumner v. Mata*, 449 U.S. 539, 543–44, 101 S.Ct. 764, 767, 66 L.Ed.2d 722 (1981) (*Sumner* I). Nevertheless, 28 U.S.C. § 2254(d) limits this authority by mandating a presumption that the factual determinations of the state courts are correct. This presumption is rebutted or inapplicable when one of the seven specified factors showing a denial of due process is present (§ 2254(d)(1)–(7)) or the federal court determines that the state's findings are not fairly supported by the record (§ 2254(d)(8)). *Sumner v. Mata*,

455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982) (*Sumner* II).

■ It appears from the record that Bashor did receive due process of law in the state court proceedings and that the state's findings are fairly supported by the record. We therefore, will accord the state's factual findings the required presumption of correctness, as did the district court.[1]

Bashor has set forth numerous grounds for relief. We consider each contention and its pertinent facts under separate headings.

### 1. *Denial of Evidentiary Hearing*

■ Bashor contends that the federal district court should have granted him an evidentiary hearing on his claims of: (1) insufficiency of the evidence, (2) erroneous admission of evidence of threats made by Bashor to Irgens, (3) ineffective assistance of counsel, and (4) improper jury instructions on self-defense. To be entitled to an evidentiary hearing, we must determine (1) whether petitioner's allegations, if proved, would establish the right to relief, and (2) whether the district court was required to hold an evidentiary hearing to ascertain facts to establish the truth of the allegations. *Townsend v. Sain*, 372 U.S. at 309, 83 S.Ct. at 755; *Harris v. Pulley*, 692 F.2d 1189, 1197 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787, and *cert. denied,* —— U.S. ——, 103 S.Ct. 1450, 75 L.Ed.2d 804 (1983). We have determined that a federal evidentiary hearing was not required. Although petitioner's allegations, if proved, would entitle him to relief, there is no need for a federal evidentiary hearing to ascertain facts to support those allegations.

The issues of admissibility of evidence and propriety of jury instructions were given a full hearing by the state court. A federal evidentiary hearing was not required on those issues. *Townsend v. Sain,*

372 U.S. at 312–13, 83 S.Ct. at 756–57 (federal evidentiary hearing required unless full and fair, reliable hearing in a state court). Whether the evidence was sufficient to support the verdict must be determined from a review of the evidence in the record in the *state* proceedings. No evidentiary hearing was required on this issue before the federal district court.

An evidentiary hearing is sometimes necessary to determine whether assistance of counsel was effective. *See Sober v. Crist,* 644 F.2d 807, 808 (9th Cir.1981) (remand for hearing because "record does not show whether counsel was effective or not"); *Miller v. McCarthy,* 607 F.2d 854, 857 (9th Cir.1979) (remand for hearing on contentions that petitioner urged attorney to act, but attorney failed to discuss or prosecute the appeal). Bashor claims that his trial counsel (1) failed to elicit exculpatory testimony, (2) failed to object to testimony offered at trial that had already been ruled inadmissible, and (3) failed to request an instruction on lesser included offenses. The state court records for this case are adequate to review these allegations of ineffectiveness. (See discussion on effectiveness of counsel.) A federal evidentiary hearing was not required to resolve the question of the competency of counsel.

■ In a memorandum attached to his petition, Bashor argued that a courtroom outburst at trial demonstrated that the trial was conducted in such a hostile atmosphere that he should have been granted a change of venue. Bashor failed to set forth in his petition for a writ of habeas corpus or in the memorandum any facts concerning the alleged courtroom outburst or supporting the conclusion that he was tried in a hostile community. A federal district court is not required to grant an evidentiary hearing where the allegations in the petition are "conclusory and wholly devoid of specifics." *Boehme v. Maxwell,*

---

1. A federal court reviews a state prisoner's habeas corpus petition to determine whether the petitioner received an unfair trial under the federal Constitution. The district court below did determine that the trial met federal standards, but also reviewed the proceedings in terms of Montana state law. This state law review is not the task of a federal court and is superfluous to the decision below.

423 F.2d 1056, 1058 (9th Cir.1970). A habeas corpus petitioner seeking an evidentiary hearing must allege actual facts which if proved would entitle him to relief. *Townsend v. Sain*, 372 U.S. at 312, 83 S.Ct. at 756; 28 U.S.C. § 2242.

In the absence of the allegation of any facts, the district court could only speculate about the nature of the "courtroom outburst". The district court did not err in refusing to hold an evidentiary hearing where no facts were pleaded from which it could be inferred that the petitioner was tried before a hostile jury or that the courtroom disturbance had a prejudicial impact on his constitutional rights.

### 2. *Denial of Appointed Counsel*

■ Bashor contends that the district court abused its discretion by not appointing counsel to represent him in district court under the authority of 18 U.S.C. § 3006A(g). Section 3006A(g) provides that counsel may be appointed for an impoverished habeas petitioner whenever "the court determines that the interests of justice so require...." Such appointment of counsel becomes mandatory, when an evidentiary hearing is required. Rule 8, 28 U.S.C. foll. § 2254; *Wood v. Wainwright*, 597 F.2d 1054 (5th Cir.1979). The district court concluded that an evidentiary hearing was not required. Appointment of counsel was, therefore, not mandatory but discretionary.

The district court found that the petitioner was adequately representing himself and stated that less stringent standards would be applied to his pleadings than to those drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (*pro se* complaint held to less stringent standards). Although the appellant is over 60 years of age and has no background in the law, he thoroughly presented his issues in the habeas petition and the accompanying memorandum of law. The court acted within its discretion when it determined that the interests of justice did not require appointment of counsel.

### 3. *Change of Venue*

Bashor contends that because of pretrial publicity and community bias only a change of venue could assure him a fair trial.

■ The Sixth and Fourteenth Amendments guarantee an accused the right to an impartial jury. A change of venue is not the only procedure available to assure an impartial jury, but it must be available as an option when the community from which the jury is to be drawn is so permeated with hostility that no other procedure can adequately protect the constitutional rights of the accused. *Groppi v. Wisconsin*, 400 U.S. 505, 509–11, 91 S.Ct. 490, 492–93, 27 L.Ed.2d 571 (1971) (continuances and voir dire examination are not always adequate to effectuate constitutional guarantee to impartial jury). Montana law does provide for a change of venue when there is "such prejudice that a fair trial cannot be had...." Mont.Code Ann. § 46–13–203(1).

Bashor made a motion for a change of venue prior to his trial. The Montana judge held a full hearing on the motion and reserved his ruling until after the voir dire examination. After a careful voir dire examination, the judge denied the motion. The state appellate court reviewed the record and found that the trial judge did not abuse his discretion in denying the motion.

■ Our duty as a federal court sitting in habeas corpus is to make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (federal judge has duty independently to evaluate voir dire testimony).

#### a. *Prejudicial Publicity and Community Hostility*

Bashor contends that news accounts which appeared shortly after the homicide aroused the community against him and made it impossible to select a fair and impartial jury without a change of venue.

Bashor submitted one article from a local newspaper and a single news broadcast as proof of prejudicial publicity. The newspaper article carried the headline "Bashor Charged with Deliberate Homicide in Shooting." The accompanying story read as follows:

Shades of the old west were re-enacted at Bert's Bar in Kevin early Saturday morning, when a bar patron was shot down and killed, at about 1:15.

According to reports, James F. Hurley, 41, was inside the bar when Howard 'Ozzie' Bashor 56, drove up and sent word inside for Hurley to come outside. Hurley walked outside and was shot down.

In the radio broadcast, the reporter stated that Hurley "was apparently shot as he was leaving a Kevin tavern." *State v. Bashor,* 614 P.2d at 474–75. These stories were reported shortly after the homicide six months before trial.

As evidence of community bias against him, Bashor points to threats against his caretaker, his brother, and the justice of the peace who considered his bail motion. Most of these threats were made anonymously over the telephone by bar patrons. *State v. Bashor,* 614 P.2d at 475.

■ The fact that there was extensive knowledge in the community of the crime and the defendant is not sufficient to render the trial presumptively unfair. *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977) ("under *Murphy,* extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair.")

■ Where a claim is made that a person has been denied due process as the result of the denial of a change of venue, we must look to the voir dire examination to determine if there is any evidence that there was "such hostility to petitioner by the jurors who served in his trial as to

suggest a partiality that could not be laid aside." *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

■ The right to an impartial jury does not mean that the jury must be ignorant of the subject matter involved. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1642.

Our review of the record in Bashor's state court proceedings discloses that approximately one third of those questioned expressed some preconception of guilt, ranging from a vague notion to certainty. Out of 60 prospective jurors and alternate jurors, 29 were excused for cause. The 29 excused included: six who were excused because they suffered from poor health or economic hardship, three who were excused because they were related to the victim or the defendant, two who were excused because they expressed a bias in favor of the defendant, and five who were excused by stipulation or without objection by counsel with no indication in the record of the reason. Thus, there were 13 jurors who were excused because they expressed some bias against the defendant.[2] None of those selected for the jury stated that they had formed an opinion of guilt or innocence. Most of the prospective jurors did not know about or had forgotten the pretrial publicity that Bashor contends was prejudicial. Few remembered more than the fact of a shooting. None of the jurors selected expressed any prejudice based on the pretrial publicity. All stated that they could be fair and impartial.

■ Prior to the voir dire examination, a trial judge can only speculate about the reasonable likelihood that prejudicial publicity and incidents reflecting bias against a defendant will deny him a fair trial. After the jurors have been examined, the trial judge can made an informed decision. The voir dire also provides the reviewing court

---

**2.** In *Irvin,* 90 percent of the prospective jurors examined on their opinion stated that they had some preconception of guilt, ranging from mere suspicion to absolute certainty. Out of a panel of 430 persons, 268 were excused for cause. Eight of the 12 persons selected as jurors had thought the defendant was guilty. 366 U.S. at 727, 81 S.Ct. at 1645.

with a record containing the sworn testimony of persons from the community. This record enables the reviewing court to determine whether a jury of fair and impartial jurors can be selected from that community. We conclude, after a careful review of this record, that notwithstanding the news accounts and the anonymous threats, the jury selection process resulted in the selection of jurors free from prejudice against Bashor.

### b. *Failure to Exclude Juror Pettigrew*

Bashor argues that he was denied due process because his challenge of juror Eileen Pettigrew for cause was denied. During voir dire examination it was revealed that Donna Hurley, the victim's daughter, had been a pupil in a dance class taught by the juror. Mrs. Pettigrew stated that she did not know the victim. She stated she felt sympathy for the child because she had lost her father.

In response to defense counsel's questioning, Mrs. Pettigrew stated that she could not give her positive assurance that she could give Bashor a fair trial.[3] In response to the prosecutor's questioning, she stated that she could render a fair and impartial verdict based on the evidence.[4] The court then asked her to explain her answers:

**3.** Questioning by defense counsel Mr. Conner:

Q. We want the State and the defendant in this case to get a fair trial, understand?

A. Yes.

Q. What we are concerned about is our very heavy responsibility here. This is a deliberate homicide charge, which is certainly one of the most serious crimes a man can be charged with. You do understand that, do you not?

A. Yes.

Q. Now knowing all these things, do you think, because of your relationship with the daughters of the deceased, and in particular with one of the daughters that you had instructed as a student over a period of years, and because you were sympathetic and, let us say, somewhat emotional as a result of her dad being shot, that these things could possibly have some bearing on how you would view this case and the testimony that will be presented in the trial?

A. Well, I suppose to some extent it will always be there. I don't believe in killing. You talk about going on self defense and—well, I suppose it would affect me. I imagine it would affect me.

Q. That might affect the way you listen to the testimony of the witnesses? For example, if Brenda Hurley would testify or when Brenda Hurley's mother would testify?

A. Yes, I think it would.

Q. And as far as the defense goes, apparently from what you tell me, I get the impression that you look upon the defense of self defense as somewhat of a technicality?

A. What do you mean?

Q. Well, why don't you tell me what you think about self defense. I get the impression that you don't believe in self defense. Is that right?

A. Well, no.

Q. You don't think a person would ever be entitled to the defense of self defense if in his mind he truly believed his life was in danger or that he was in danger of bodily harm?

A. Well, of course, that's self defense, but you would have to look at that differently. I mean I don't believe in killing—period! But in self defense what are you going to do? I mean—

Q. Well, would the fact that a gun was used in this case to defend Mr. Bashor disturb you?

A. Well, any of it disturbs me. Like I said, I don't believe in killing.

Q. You have some moral qualms about a person using a gun to defend himself?

A. To defend himself? No.

Q. Do you think you could be a fair and impartial juror in this case?

A. Well, no, I really don't think I can.

Q. You can't give your positive assurance that you could give Mr. Bashor a fair trial?

A. There's a question about it, so I guess my answer is no.

Q. You can't give us your positive assurance?

A. No.

MR. CONNER: We challenge the juror for cause, Your Honor.

**4.** Questioning by the prosecutor Mr. Kalbfleisch:

Q. Your statement to Mr. Conner, are you basing that on the proposition expressed by Mr. Conner when you and he were talking about being against killing and guns?

A. No, because I still believe in self defense.

Q. If you were instructed to go to the jury room and disregard your friendship and such, could you do that?

A. Yes.

Q. Would you follow that instruction and honestly go in and base your decision upon the facts presented in the trial of the case?

A. Yes, on the facts.

Q. And that is what you would base the verdict on, the facts that come out in the courtroom?

A. Yes.

Q. You said previously to Mr. Conner that you didn't think you could be a fair juror. Explain what you mean or what your thoughts are on that, and just why you think this.

A. Okay. Mr. Kalbfleisch, when he asked me, was asking if I could do this on the facts, you know, of the case, and I really think I can. The other lawyer was questioning on my emotions, and those are two different things.

Q. Undoubtedly you will be instructed that if you were to serve as a juror in this case the case must be decided upon the evidence presented in the courtroom ---

A. Yes.

Q. ... and that you are not to decide this case on sympathy, conjecture, or any other thing. Now would you be able to follow an instruction of that nature?

A. Yes, I really think I could because even though I would feel sympathy or emotion my conscience would not let me. I would still have to be fair when it came to choosing.

Q. You think you could be a fair juror?

A. Yes, I think I could.

Q. I gather what you are saying is that you are a compassionate person, but a fair person also?

A. Yes.

■ Based on the totality of the juror's responses, the Montana trial judge concluded that Mrs. Pettigrew could be a fair and impartial juror. Our independent review of the record leads us to the same conclusion. Mrs. Pettigrew's responses reflect the thinking processes of a compassionate and conscientious juror who was completely honest about her feelings and her

Q. Are you the type of person who, when you take that oath to go in and listen to the evidence and base your decision on the evidence, would do that?

A. Yes.

Q. That is the standard?

A. Yes.

Q. It isn't an unreasonable standard. I know it is difficult to sit on a case where there is a shoot-incident, but do you feel it would be similar to any other case where someone was similarly shot?

thoughts. She demonstrated that she had the capacity to recognize her commendable sympathy for an orphaned child and her responsibility to set those emotions aside and to decide the case on the evidence presented at trial. When her duties as a juror were made clear to her, she assured the trial judge she could be a fair juror and decide the case on the proved facts. We cannot expect more from any juror.

At Bashor's request, the Montana court read the following instruction to the jury primarily to remind Mrs. Pettigrew of her responsibility as a juror:

> You are instructed that a juror must not allow his previous opinion or impressions to have the slightest influence, or to affect, impair, or destroy a reasonable doubt which he otherwise would entertain upon the evidence.

We are satisfied that the court did not err in denying the challenge for cause directed at Mrs. Pettigrew.

c. *The Courtroom Disturbance*

■ Bashor also contends that a courtroom outburst during his testimony at trial indicates that the trial was conducted in a hostile atmosphere. As noted above, Bashor failed to allege facts to show the nature of the disturbance in the courtroom. Nevertheless, even assuming that the interruption of the court's proceedings was the result of hostility directed to Bashor, the record shows that the trial judge quickly and properly controlled the spectators. No further disruption occurred. Thus, the court's prompt admonition effectively prevented any additional untoward conduct. *See Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 1519, 16 L.Ed.2d 600

A. Yes.

Q. The trial is by a jury of peers, and unless you have some preconceived notion or opinion of the defendant's guilt—I mean that's what we are trying to avoid—we want jurors who have no preconceived notions or opinions so that both the defendant and the state can have a fair trial. Do you feel that you could go in and render a fair and impartial verdict based on the evidence?

A. Yes.

(1966) (judge should have controlled carnival atmosphere at trial).

Our reading of the record shows that the trial judge was careful to prevent prejudiced jurors from being impaneled. The potential jurors were questioned individually about their possible bias. The judge allowed extensive questioning by counsel and took an active role to satisfy himself that the jurors would be impartial. His instructions informed the jury of its duty. The requirements of due process were met. Since an impartial jury was impaneled, the requested change of venue was not constitutionally required.

### 4. *Polygraph Examination*

Bashor contends that the results of a polygraph examination taken by *William Schaeffer*, a witness who was with Bashor the night of the shooting, should have been admitted at trial. The trial judge ruled that the results of a polygraph examination were inadmissible as a matter of law.

■ Traditionally, rules of evidence and procedure are matters of state law. We review a state's rules only to determine that the defendant's due process rights were not violated. As the Supreme Court uses a balancing test to determine when state rulings are unconstitutional, we, too, balance the state's interest in reliable and efficient trials against the defendant's right to present a defense. *Perry v. Rushen*, 713 F.2d 1447 at 1449–52 (9th Cir.1983).

■ The Supreme Court of Montana excludes polygraph testimony on the basis that (1) it lacks reliability and (2) it invades the province of the jury when it merely serves to support the credibility of a witness. *State v. Beachman*, 616 P.2d 337, 339 (Mont.1980). The evidence that Bashor wanted to introduce served only to show that the witness *Schaeffer* believed that Hurley had been the aggressor. *State v. Bashor*, 614 P.2d at 478–79 (the record of the questions and answers asked at the polygraph examination). Although the results of the polygraph examination may have corroborated Bashor's self-defense

theory, Schaeffer's testimony offered relatively weak support. Schaeffer testified at trial that he never saw the gun and that he had jumped out of the car before Bashor pulled out the gun. The jury heard Schaeffer's testimony and determined his credibility from his demeanor as a witness. Exclusion of the polygraph evidence did not result in an unfair trial.

### 5. *Prior Acts and Threats*

■ Bashor contends that the admission into evidence of threats made by him to Irgens and of his surveillance of Irgens violated his constitutional rights because the evidence was prejudicial and irrelevant.

As we noted above, rules of evidence are generally matters of state law. *Perry v. Rushen*, 713 F.2d 1447 at 1449 (9th Cir. 1983). We agree with the Supreme Court of Montana that this evidence of Bashor's relationship with Irgens was relevant and necessary to prove Bashor's state of mind. 614 P.2d at 482–83. Although this testimony was unfavorable to Bashor, its admission into evidence was not unfair or violative of due process.

### 6. *Sufficiency of the Evidence*

■ Bashor contends that the evidence presented to the jury was insufficient to support the verdict of guilty of deliberate homicide. In particular, he challenges the sufficiency of the proof of the element of intent. To return a verdict of guilty of deliberate homicide in Montana, the jury must find beyond a reasonable doubt that the defendant "purposely or knowingly" caused the death of another human being. Mont.Code Ann. § 45–5–102(a). Under Montana law, the term "purposely" describes a conscious object to engage in conduct or cause a result. Mont.Code Ann. § 45–2–101(58). A person acts "knowingly" when he or she is aware of his or her conduct or aware that a certain result of his or her conduct is highly probable. Mont.Code Ann. § 45–2–101(33).

■ The critical inquiry in a federal habeas corpus review of the sufficiency of the evidence to support a criminal convic-

tion is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Viewing the record in the light most favorable to the state, there was sufficient evidence presented from which an inference could be drawn of an intent purposely and knowingly to cause the death of a human being: (1) Bashor followed and harassed Irgens and Hurley, (2) Bashor waited outside Bert's Bar knowing Hurley was there, (3) Bashor beckoned Hurley to come to the car, (4) Bashor carried a loaded gun in his vehicle. Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that Bashor held the requisite intent for deliberate homicide.

### 7. *Self-Defense Instructions*

Bashor contends that the trial court denied him due process by inadequately instructing the jury on self-defense.

In considering a habeas corpus petition which seeks reversal of a state court conviction, a federal court does not review jury instructions in isolation but in the context of the overall charge to the jury as a component of the entire trial process. The contested instructions cannot be merely "undesirable, erroneous, or even 'universally condemned,' " but must violate the defendant's due process rights guaranteed by the Fourteenth Amendment. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Bashor asked for several instructions (forcible felony, defense of an occupied structure, serious bodily injury) that were not relevant to Bashor's trial. *See State v. Bashor,* 614 P.2d at 484–85 (no forcible felony here, no occupied structure, no aggravated assault). Bashor also requested a definition of serious bodily harm. Under Montana law, however, the jury decides what constitutes serious bodily harm. 614 P.2d at 484. At trial Bashor presented evidence to support his theory that Hurley's actions threatened serious harm to Bashor's eyesight. It was the jury's task to determine whether serious bodily harm was threatened. Denial of these instructions does not warrant federal relief.

The instructions given on the law of self-defense in Montana used phrases that in isolation appear to be erroneous. Instructions No. 24 and 28 refer to an "urgent" danger and an "absolutely necessary" killing. 614 P.2d at 485–86 (text of instructions). Instruction No. 26 refers to "necessary self-defense." 614 P.2d at 486 (text of instruction). Nevertheless, read in context, these instructions, together with Instruction No. 22, which was virtually identical to the Montana self-defense statute,[5] fairly instructed the jury on the law of self-defense.

Bashor contends that there was no factual basis for the giving of an instruction that defines "an aggressor." 614 P.2d at 486 (text of Instruction No. 27). Even though Bashor challenges the truth of the matter, the record does contain testimony of prior acts of hostility towards Hurley and actions designed to attract the victim's attention just before the shooting. This testimony justified giving this instruction.

---

**5.** Instruction No. 22:

You are instructed that a person is justified in the use of force or threat to use force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or commission of a forcible felony.

Mont.Code Ann. § 45–3–102:

A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony.

*See State v. Bashor,* 614 P.2d at 486. The jury instructions, viewed as a whole in the context of the trial process, did not violate Bashor's due process rights.

### 8. *Lesser Included Offenses Instructions*

■ Bashor contends that he had a constitutional right to have the jury instructed on lesser included offenses. The Supreme Court of Montana considers negligent homicide and mitigated deliberate homicide to be lesser included offenses of deliberate homicide. 614 P.2d at 487.

■ "Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *James v. Reese,* 546 F.2d 325, 327 (9th Cir.1976). This general statement may not apply to every habeas corpus review, because the criminal defendant is also entitled to adequate instructions on his or her theory of defense. *United States v. Kenny,* 645 F.2d 1323, 1337 (9th Cir.) (*reh'g and reh'g en banc denied, appeal amended*), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425, *cert. denied,* 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981) ("jury must be instructed as to the defense theory of the case"). *See also Keeble v. United States,* 412 U.S. 205, 213, 93 S.Ct. 1993, 1998, 36 L.Ed.2d 844 (1973) (Court has never explicitly held that due process gives federal defendant right to lesser included offense instruction, but a statute precluding such an instruction would raise a difficult constitutional issue). Even assuming that the failure to give a lesser included offense instruction could violate a criminal defendant's constitutional rights, we are not faced with such a situation here. Bashor not only did not request instructions on lesser included offenses, but his counsel objected to the mitigated deliberate homicide instruction, choosing to base the defense on the theory that Bashor was either guilty or not guilty of deliberate homicide. There was no fundamental unfairness in the trial court's failure to instruct the jury on lesser included offenses under these circumstances.

### 9. *Closing Argument*

■ Bashor contends that remarks made by the prosecutor in his closing argument were so prejudicial that Bashor was denied a fair trial. The prosecutor told the jury that Schaeffer came to town knowing that he and Bashor would fight Hurley. Bashor claims that the prosecutor knew that these statements were untrue and unfairly took advantage of the fact that the results of the polygraph examination were excluded by the court.

The prosecutor's comments are evaluated in the light of the evidence as a whole. *Carothers v. Rhay,* 594 F.2d 225, 230 (9th Cir.1979). Schaeffer testified at trial to what he knew of the events. There was sufficient evidence to support the prosecutor's version of the events that led up to the homicide. The polygraph results were not admitted because they were untrustworthy. They had no probative value. Under these circumstances, the remarks of the prosecutor did not impair Bashor's right to a fair trial.

### 10. *Adequacy of Counsel*

Bashor contends that he was denied effective assistance of counsel because: (1) counsel failed to elicit exculpatory testimony; (2) counsel improperly objected to the instruction on mitigated deliberate homicide and failed to offer an instruction on negligent homicide; and (3) counsel failed to object to inadmissible testimony.

■ To obtain relief on a habeas corpus review, the petitioner must (1) show that his or her counsel made errors that a "reasonably competent attorney acting as a diligent conscientious advocate would not have made," and (2) demonstrate prejudice. *Hines v. Enomoto,* 658 F.2d 667, 674–75 (9th Cir.1981) (*reh'g and reh'g en banc denied*) (citing *Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir.1978) (en banc) *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979)).

Bashor contends that defense counsel should have shown that he and Irgens were on friendly terms just before the shooting, that he carried a gun in his car to shoot predators on his farm, that he felt no remorse for Hurley's death because he felt no criminal responsibility, and that Enneberg had stated that Schaeffer had been shouting outside Bashor's vehicle but changed his story prior to trial. The record discloses that evidence was presented on each of these points. Irgen's mother, Josephine Shay, testified that Bashor thought well of Irgens and would always stand by her. Bashor testified that the gun was in the car most of the time and that he used it to hunt gophers. Bashor also testified on cross-examination that he did not have much remorse over the death because he was trying to protect himself. Duane Enneberg testified that he never heard any shouting, that Irgens never told him that she heard any shouting, and that he did not go over to Bashor's vehicle because of any shouting.

▮ It is true that counsel did not offer a negligent homicide instruction and that he objected to the mitigated deliberate homicide instruction. The record discloses that counsel did so not out of ignorance of the law but as the result of a tactical decision that the jury should be forced to the choice of finding Bashor guilty of deliberate homicide or acquitting him outright. With the benefit of hindsight we know that this strategy was incorrect; however, it did not constitute ineffective assistance of counsel. *United States v. Stern*, 519 F.2d 521, 524–25 (9th Cir.), *cert. denied*, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975), (reasoned tactical decisions are not faulted, even if in retrospect better tactics were available).

▮ Bashor also argues that his counsel should have objected to Irgen's testimony about Bashor's threats to her. The trial court had earlier granted Bashor's motion *in limine*, ruling this testimony inadmissible. The petition does not set forth facts which would permit us to conclude that the failure to object was not a tactical decision

on counsel's part to avoid the appearance that Bashor was trying to conceal the truth. We are satisfied beyond a reasonable doubt that Bashor was not denied effective assistance of counsel.

CONCLUSION

We have made an independent review of the entire record in search of constitutional error. We have concluded that Bashor's constitutional rights were not violated. The District Court correctly denied Bashor's petition for a writ of habeas corpus. AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

I dissent from part 3 of the majority's opinion and from that portion of part 1 holding that no facts were pleaded from which it could be inferred that petitioner was tried before a hostile jury or in a hostile community. I would hold that the trial court's refusal to grant a change of venue denied Bashor due process of law. *See Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). The due process clause and the sixth amendment entitle criminal defendants to an impartial and disinterested jury. *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.) *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *see Murphy v. Florida*, 421 U.S. 794, 797, 95 S.Ct. 2031, 2034, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The majority recognizes that due process requires a change of venue when the degree of prejudice in the community makes it impossible to impanel an impartial jury. The majority concludes, however, that the voir dire proceedings were constitutionally adequate, that an impartial jury was, in fact, selected and that, therefore, Bashor received a fair trial. On the record before us, that conclusion is insupportable.

The record reveals that the trial judge reserved ruling on the change of venue motion until after he completed voir dire. At that time, the totality of the circumstances reflected in the evidence before

him demonstrated that the community was "permeated with hostility toward the defendant." *Groppi v. Wisconsin*, 400 U.S. 505, 510, 91 S.Ct. 490, 493, 27 L.Ed.2d 571 (1971). The homicide occurred in a very small community;[1] the crime was big news. The voir dire testimony indicates that in addition to receiving newspaper and radio publicity, the homicide was the subject of widespread, persistent rumors and gossip.[2] The passions of the community were sufficiently inflamed that the judge who released Bashor on bail pending trial determined that it would not be safe for him to remain in the county. I find Montana Supreme Court Justice Sheehy's dissenting opinion on the venue issue in this case compelling:

> The newspaper article using unfounded facts to portray the incident as an old west shoot-out together with the news broadcast over radio station KSEN created a climate of opinion in the county which is evidenced by the several calls received by the Toole County Sheriff's Office to determine whether the defendant had been released from jail on bond, and making known the callers' objections if the defendant was to be released. The justice of the peace who set the bail bond at $50,000 received thereafter an anonymous telephone call indicating that the defendant would be shot if he were released. The situation was bad enough that when the defendant was released on bond, the judge made it a condition of his release that he leave Glacier and Toole counties, except for court appearances, for his own protection. The caretaker who managed the Bashor property in Bashor's absence was then threatened and intimidated.

*State v. Bashor*, 614 P.2d 470, 487–88 (Mont.1980) (Sheehy, J., dissenting).

The trial court disqualified 29 of 60 jurors for cause. Several testified that they had been close friends of the victim. Others indicated they had formed the opinion that Bashor was guilty and were not certain they could put that opinion aside in their deliberations. Indeed, 13 of the 29 disqualifications for cause were for stated bias. Additional prospective jurors excused for cause *other than bias* testified that they felt sufficient prejudice that they would be unable to be fair. The transcript of the voir dire examination reveals that, in instances in which counsel failed to stipulate to the dismissal of prospective jurors with stated bias, the trial judge questioned the prospective jurors in an attempt to persuade them to set their biases aside.[3] The judge denied challenges for cause of

1. The county's population was less than 6,000.

2. The majority appears to infer that because most of the prospective jurors had forgotten the details of the newspaper and radio accounts of the homicide, the pretrial publicity had no prejudicial effect on the jury. Several prospective jurors indicated in voir dire, however, that community gossip about the crime continued. The majority fails to consider the prejudicial effect of the pervasive talk about the incident and the upcoming trial reflected in the record.

3. For example, Bashor's counsel challenged prospective juror Benjamin for cause after she testified that she had heard that Bashor had shot the victim down in cold blood and she felt that if Bashor claimed he'd been acting in self-defense he would have to prove it to her beyond a shadow of a doubt. The court excused Benjamin only after failing to rehabilitate her during the following examination:

> The Court: Mrs. Benjamin, have you ever had occasion to come through the front door of this courthouse?
> A. The front door? Yes, I did today.

> The Court: Did you happen to glance above the doorway and see what is up there?
> A. No. Oh, I may have.
> The Court: Well, in the stone there is chiseled a scale. That scale is symbolic of the concept of justice. It is evenly balanced. In any case, civil or criminal, everybody comes into court with an evenly balanced scale. Now in this case if the defendant should decide to present a defense, and if that defense should be self defense, he is obligated by the law, by a preponderance of the evidence, to prove his position. Just a little bit. If he puts the scale off balance just a little bit he has carried his burden of proof. On the other hand, in this case the State cannot obtain a conviction unless they prove, beyond a reasonable doubt, that the defendant is guilty. Do you understand those positions? It is a matter of degree—a little bit or a big bit. Do you understand that?
> A. Yes, I understand what you say.
> The Court: You indicated to both the state and the defense that you could not be convinced in your own mind unless there was

the two prospective jurors he succeeded in rehabilitating.

In *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.1977), this court stated:

> proof beyond the shadow of a doubt. Of course, the law isn't that. The law doesn't require this defendant to prove his defense, if he should select a defense, beyond the shadow of a doubt. The law does not require the state to prove its case against the defendant beyond a shadow of a doubt. If it went to beyond a shadow of a doubt the scales would be like that—clear down. There are very few things and maybe nothing that can be proved beyond a shadow of a doubt. If you and I wanted to, we could doubt whether the sun was going to come up tomorrow, and neither one of us could prove that the sun would not come up. So that burden of proof beyond a shadow of a doubt is not possible in most cases. Do you understand that?
> A. Yes.
> The Court: Now if there was a feeling that the State had not proven its case beyond a shadow of a doubt then you could vote, I suppose, that the defendant was innocent, is that right?
> A. Well, I suppose I would say yes. On the scale, I think in my mind, where you say the defendant is like this, and the state is like this—probably in my mind I would feel that each one should be equal. If the defendant had to make a proof it would not be up and down, like this, but his proof would have to play the balance as much as the state's proof.
> The Court: All right. Of course, that isn't the law. We aren't trying to embarass you, of course, Mrs. Benjamin and—
> A. No, and I understand that.
> The Court: You see, our forefathers decided, by the adoption of our constitution, how this nation would be run, and following that adoption this state was created and the people of this state in 1889 adopted their own constitution. In 1972 the people of our state changed their constitution. So the law, of course, is the Constitution of the United States, the Constitution of the State of Montana, the legislative enactments that our legislature passes, and the judicial decisions, and they all say that a defendant in a criminal case is presumed to be innocent and that he has no obligation to present any evidence whatsoever. Now, of course, other countries have different systems of law and justice. For example, in Hitler's Germany every defendant was guilty, once arrested, and it was the Court's obligation to the state to make sure to find the defendant guilty. The German government was very efficient. They built excellent highways and war machinery and had very speedy justice. Under the German system we wouldn't have had to spend the time that we have spent here attempting to select a fair and impartial jury, because once the arrest was

A court must excuse a prospective juror if actual bias is discovered during voir dire. Bias can be revealed by a juror's express admission of that fact, but, more

> made the defendant would have been guilty unless he could prove beyond a shadow of a doubt that he was innocent. But that is not our system of justice, and that is why it is important as well as necessary to know what your feelings are, because no one in this room really knows how your mind works and what your opinions are. No one knows that except you, and so we have to ask you questions, of course.
> A. Yes.
> The Court: There is nothing immoral or illegal with disagreeing with the American law, and a lot of people do. We are interested in determining whether you agree with the American law and if you will follow it, and if you tell us that you disagree with it and won't follow it then you will be excused from jury duty, and we will not embarass you in any way. Now what we are trying to determine here is, No. 1, will you follow the law of the land as stated by me in the instructions? even though you may not like the law or disagree with it, will you follow it? That's one question. Question No. 2 is have you a preconceived determination in your own mind as this time as to the defendant's guilt? In other words do you believe the defendant is guilty right now as you sit here? I will ask you that now.
> A. Yes, I would say likely.
> The Court: And, therefore, it would take evidence on his part to prove he was innocent, wouldn't it?
> A. Yes.
> The Court: Of course, that isn't the law of this country.
> A. No.
> The Court: So what you are really saying is that you are sorry, and you can go to the church camp.
> A. Well, I didn't say these things just to—
> The Court: No, I'm not accusing you of that or suggesting that. I am saying that it is only through your personal integrity and honesty that we can find a fair and impartial jury and an unbiased jury, and that is what the law of this land requires.
> A. Yes.
> The Court: It would be of no avail to select a juror that had already decided this case.
> A. That's true.
> The Court: That is what the law requires, a fair and impartial and unbiased jury, and that is what we are attempting to do. You need not feel in any way that you haven't lived up to your civic responsibility, and we commend you for your honesty. You are excused now and need not come back.
> A. Thank you.

frequently, jurors are reluctant to admit actual bias and the reality of their biased attitudes must be revealed by circumstantial evidence.

*See also Murphy v. Florida,* 421 U.S. at 800, 95 S.Ct. at 2036 ("the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights"); *Irvin v. Dowd,* 366 U.S. at 728, 81 S.Ct. at 1645. The record demonstrates that Bashor's trial court did not adhere to this standard and could not have filled the jury box if it had. The frequent expressions of firmly held convictions of Bashor's guilt themselves suggest that other jurors were subject to unexpressed bias. *See Murphy v. Florida,* 421 U.S. at 803, 95 S.Ct. at 2037 ("In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are a part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it."). Even when the pervasive prejudice reflected in the testimony of jurors excused for cause is disregarded, the record demonstrates that the remaining panel lacked the constitutionally required impartiality. At the time the trial court denied the motion for change of venue, it had already ruled on all challenges for cause. The court knew that the prospective jurors remaining on the panel included several who had testified that local rumor reflected what was, in essence, the prosecution's version of the case, two who had testified they knew and would be inclined to believe the prosecution's witnesses, and six friends or business associates of the victim's. The jury that actually served included one juror who had been a friend of the victim's and who testified that he had heard that Bashor shot the victim in cold blood because of a woman; another juror who testified he'd heard the same story; one juror who testified that she knew that Bashor had shot the victim and would not vote to acquit him unless he proved to her that he'd done so in self defense; a probation officer who worked with the prosecuting attorney; the probation officer's hus-

band, who had been a business associate of the victim's; and juror Pettigrew, who had expressed moral reservations about self-defense. As the majority notes, Pettigrew felt very close to the victim's daughter, Donna, who had been her student. Indeed, Pettigrew indicated she'd paid particular attention to accounts of the shooting because of her relationship with Donna. The majority fails to note that Pettigrew also testified that she'd known Donna's sister Brenda for three years. Pettigrew had, in fact, indicated that she believed she would be unable to listen impartially to Brenda's testimony. The prosecution called Brenda as the final witness for its case in chief. Her testimony strongly corroborated the prosecution's version of the facts.

"If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his sixth amendment right to an impartial [jury] panel." *United States v. Hendrix,* 549 F.2d at 1227; *accord United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1977). Constitutionally impermissible prejudice comprises more than boldly stated bias, and may be presumed from the " 'potential for substantial emotional involvement' inherent in certain relationships." *Id.* (quoting *United States v. Allsup,* 566 F.2d at 71–72). After a careful review of the record in light of our precedents, I conclude that the seating of juror Pettigrew, without more, would suffice to warrant reversal. A juror who has expressed both a hostility to the defendant's defense and revealed an emotional attachment to the victim's daughter that the juror herself fears may disable her in her deliberations is a biased juror. The record reflects, however, that juror Pettigrew's partiality was merely one of many "indications in the totality of the circumstances" that Bashor's trial "was not fundamentally fair." *Murphy v. Florida,* 421 U.S. at 799, 95 S.Ct. at 2035.

From the evidence before the trial court at the time it denied Bashor's change of venue motion, I conclude that it is manifest that Bashor could not have received a fair trial. My conclusion finds support in

events transpiring during the course of the trial. Bashor presented evidence to the jury in support of a claim of self-defense. Bashor's testimony was the key evidence in his case. A courtroom disturbance interrupted Bashor's recounting of the events that resulted in the victim's death. The disturbance impelled the judge to threaten to clear the courtroom before allowing Bashor's testimony to continue. The majority concludes that because the trial judge promptly controlled the outburst, it adds nothing to Bashor's claim that community hostility precluded a fair trial. The majority appears not to consider the potential prejudicial effect of such an outburst on the jury's reception of Bashor's testimony. In view of what I believe to be the ample evidence in the record of community prejudice, I find disturbing the majority's willingness to dismiss this additional evidence as insignificant.[4]

The majority's error lies in its insistence upon viewing each of Bashor's allegations in isolation, ignoring the Supreme Court's command to examine "the totality of the circumstances." *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); *Murphy v. Florida*, 421 U.S. at 799, 95 S.Ct. at 2035. The majority concludes that no single allegation demonstrates the extent of community prejudice sufficient to find a denial of due process. An examination of the totality of the circumstances reflected in the record, however, reveals a manifest pattern of community prejudice that precluded the impanelling of an impartial jury. I would reverse.

---

4. At a minimum, the majority should require an evidentiary hearing to determine the extent and nature of the disturbance before deciding that it adds nothing of significance to Bashor's allegations of community prejudice.