**UNITED STATES of America, Plaintiff,**

v.

**Allen R. McDONALD, David L. Coffman, and Peter S. White, Defendants.**

**No. F89–024 CR.**

United States District Court,
D. Alaska.

March 16, 1990.

Mark R. Davis, Acting U.S. Atty., Neil J. Evans, Asst. U.S. Atty., David Farnham, Sp. Atty., Steven Cooper, Asst. U.S. Atty., Anchorage, Alaska, for plaintiff.

Dan R. Dubitzky, Alan Zarky, Dan R. Dubitzky, P.S., Seattle, Wash., Dick L. Madson, Fairbanks, Alaska, for defendant Allen R. McDonald.

Michael J. Hemovich, Carl J. Oreskovich, Hemovich, Nappi, Oreskovich & Butler, Spokane, Wash., Glen Harper, Anchorage, Alaska, for defendant David L. Coffman.

Samuel Eismann, Eismann & Kosonen, Coeur d'Alene, Idaho, Jonathon A. Katcher, Lynch, Crosby & Sisson, Anchorage, Alaska, for defendant Peter S. White.

## AMENDED OPINION AND ORDER

JAMES M. BURNS, District Judge.

On July 14, 1988, an indictment against defendants issued after a lengthy grand jury investigation in Alaska. A superseding indictment was issued October 24, 1989, for the stated governmental purpose of "streamlining" the trial.[1] The superseding indictment contains thirty-nine counts allegedly arising from a lengthy, large-scale scheme involving bribery of various North Slope Borough[2] officials and consultants. All three defendants are charged in count I with violation of 18 U.S.C. § 1962(c), Racketeer Influenced and Corrupt Organizations Act (RICO); in count II with violation of 18 U.S.C. § 1962(d), RICO conspiracy; and in count III with violation of 18 U.S.C. § 371, conspiracy to defraud the United States "by impeding ... the lawful functions of the Internal Revenue Service ... in the ... collection of ... federal income taxes." Superseding Indictment, Oct. 24, 1989, at 29. Defendant McDonald is also charged with twenty counts of mail fraud, 18 U.S.C. § 1341 and sixteen counts of wire fraud, 18 U.S.C. § 1343; defendant Coffman is charged with sixteen counts of mail fraud and thirteen counts of wire fraud; and defendant White is charged with four counts of mail fraud and three counts of wire fraud.

All defendants move for a change of venue from Alaska (# 287).

## INTRODUCTION

Article III, § 2, United States Constitution, provides "the Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed...."

Under the Sixth Amendment, a defendant has the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed." The Supreme Court has stated "provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *Platt v. Minnesota Mining & Manufacturing Company*, 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964), (quoting *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958)). Rule 18 of the Federal Rules of Criminal Procedure provides "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Rule 21 sets forth the standards under which a motion for change of venue is to be evaluated.

■ This court has authority to determine where trial will occur[3] under the standards of Rule 21. The decision to change venue is subject to "the sound discretion" of the trial court. *United States v. Bailleaux*, 685 F.2d 1105, 1108 (9th Cir. 1982).

Defendants ask for a change of venue from Fairbanks to any place outside Alaska convenient to this court.[4]

## BACKGROUND

Although this case originated in Anchorage, it was moved to Fairbanks by Judge Andrew J. Kleinfeld, District of Alaska, on June 13, 1989, after he concluded adverse

---

1. There is no dispute that the only difference between the original and superseding indictments is the elimination of mail and wire fraud allegations as separate racketeering counts under RICO in count I.

   Defendants' motion to dismiss the superseding indictment and/or to release grand jury transcripts and records will be ruled on shortly. During the hearings on January 30, I indicated to all concerned it was my expectation the motion would be denied and we should proceed to trial readiness. I also informed the parties that any written order, assuming denial, would allow defendants the right to renew their motion at a later date.

2. The early 1980s were characterized by explosive building programs in the region. The

North Slope Borough of Alaska includes oil-rich Prudhoe Bay.

3. The Supreme Court stated: "[t]he function of the Court of Appeals ... [is] to determine the appropriate criteria and then leave their application to the trial judge on remand." *Platt*, 376 U.S. at 245, 84 S.Ct. at 772.

4. Although defendants ask only for a change of venue from Fairbanks to any place outside of Alaska, in its order of October 24, 1989, the Ninth Circuit limited choice of venue to the Western District of Washington or the District of Alaska, apparently unapprised of the straightforward language in *Platt, supra* note 3.

publicity precluded a fair trial in Anchorage. On October 6, 1989, the case was assigned to Senior Judge A. Andrew Hauk of the Central District of California by Chief Judge Alfred T. Goodwin of the Court of Appeals under 28 U.S.C. § 292(b). Defendants orally renewed their motion for change of venue on October 10, 1989. Judge Hauk then ordered the case moved from Fairbanks to the Central District of California[5] primarily for the court's convenience and because of Judge Kleinfeld's statements to Judge Hauk that "adverse publicity ... ha[d] permeated the atmosphere in Fairbanks as much as it had permeated the atmosphere in Anchorage." Transcript of Telephonic Pretrial Conference at 15 (Oct. 10, 1989).

On October 24, 1989, upon petition of the United States, the Court of Appeals issued an order vacating Judge Hauk's order changing venue to the Central District of California. On October 31, 1989, the Ninth Circuit issued a further order stating its "vacation of ... [Judge Hauk's] transfer order ... is without prejudice to a transfer of the trial to any federal district court [sic] in the District of Alaska or the Western District of Washington" (presumably meaning any place in Alaska where the court, under 28 U.S.C. § 81A, is entitled to hold court). Judge Hauk recused himself from the case in an order issued November 1, 1989. Chief Judge Goodwin assigned the case to me on November 16, 1989. On December 11, 1989, defendant McDonald petitioned the Ninth Circuit requesting I be given complete discretion as to the choice of venue; e.g., District of Oregon, Eastern District of Washington, etc. No ruling on this motion has issued from the Ninth Circuit.

## ANALYSIS

■■■ Defendants rely on both Rule 21(a) and 21(b) of the Federal Rules of Criminal Procedure to support their motion for change of venue.

*Prejudice, Rule 21(a)*

Rule 21(a) provides:

The court upon motion of the defendant shall transfer the proceeding as to that defendant to another district ... if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

An accused has the right to an impartial jury under the Sixth and Fourteenth Amendments; however, the Supreme Court and, in turn, the Ninth Circuit, have made it clear "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977), *reh'g denied*, 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977); *Bashor v. Risley*, 730 F.2d 1228, 1235 (9th Cir.1984), *cert. denied*, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984) ("extensive knowledge within the community of the crime or of the defendant is not sufficient to render the trial presumptively unfair"). *See also Silverthorne v. United States*, 400 F.2d 627, 638–39 (9th Cir.1968), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971) (presence of extensive pretrial publicity alone is not sufficient to require a change of venue). As the Ninth Circuit stated, "[t]he right to an impartial jury does not mean that jury must be ignorant of the subject matter involved." *Bashor*, 730 F.2d at 1235. It is unreasonable to expect prospective jurors to be unfamiliar with a case that is both notorious within and of intense public interest to the community. It is enough if a juror can overcome his impressions, prejudices, and biases to render a fair decision based on the evidence introduced at trial. *Bashor*, 730 F.2d at 1235, (citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961)).

**5.** Both the renewed motion and Judge Hauk's order changing venue were made during a pretrial conference held telephonically on October 10, 1989. The parties had some difficulty with the telephone connection (sound fading in and out).

The Ninth Circuit has generally relied on voir dire as the key to determining whether a fair and impartial jury may be achieved in a particular place. *Bashor*, 730 F.2d at 1235, (citing *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)). *See also United States v. Bailleaux*, 685 F.2d at 1109 (Ninth Circuit refused to reverse denial of venue change after trial judge conducted extensive inquiries of prospective jurors during voir dire). An attempt to measure the prejudicial effect of publicity on prospective jurors prior to voir dire would be merely speculative. *Bashor*, 730 F.2d at 1235. A careful voir dire examination will inform the trial judge as to any overwhelming prejudice that would make it difficult for jurors to render a fair decision.[6]

Defendants claim a fair and impartial jury cannot be selected in Alaska because of the pervasive, adverse publicity given to the North Slope Borough cases. As a result of media saturation, defendants assert that only a change of venue from Alaska can assure them a fair trial. In its memoranda in opposition to defendants' motion for change of venue, the government has insisted this trial take place in Alaska;[7] however, the government's arguments lose power when it is noted the government previously indicated its willingness to stipulate to Seattle as the trial site. Transcript of Telephonic Pretrial Conference at 21 (Oct. 10, 1989).

Defendants point to the extensive coverage given the North Slope Borough cases in newspapers widely distributed in Anchorage, Fairbanks, and other Alaska locations in addition to considerable television and radio coverage. During the North Slope Borough investigation, over 1500 articles appeared in newspapers distributed in Alaska from January 1985 to September 1986. Statistical Summary Articles, Gogerty & Stark Issue Tracking Reports (Sept. 3, 1985, and Sept. 6, 1986). The related trial, however, of Lewis M. Dischner and Carl W. Mathisen, *United States v. Dischner, et al*, No. A87–160 CR, which began in September 1988 and ended in May 1989, took place in Anchorage even though the North Slope Borough investigation and resulting indictments were popular media topics; in addition, Dischner and Mathisen were well-known figures in Alaska. A jury was empaneled after 3½ weeks of careful, individual voir dire conducted by Judge James M. Fitzgerald, District of Alaska. The latest tracking report summarizing articles appearing in newspapers distributed in Alaska from 7/14/88 to 10/20/89 shows 139 articles in the Anchorage Daily News and 106 in the Anchorage Times. Statistical Summary Articles, Gogerty & Stark Issue Tracking Report (Dec. 7, 1989).[8] A review of the headlines compiled in the tracking report suggests these articles did not focus on the defendants in the present case; in addition, these defendants are Washington-based rather than Alaskan.

At this stage, I cannot say the prejudice is so great that a fair and impartial jury cannot be selected in Alaska; therefore, a change of venue under Rule 21(a) is not warranted at this time. If venue were to remain in Alaska and it appeared after sufficient voir dire that an impartial jury could not be attained in Alaska, then my duty to transfer would be clear.

*Convenience, Rule 21(b)*

Rule 21(b) provides:

For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district.

(Nov. 1, 1989); the government reiterated this position in plaintiff's supplemental opposition to defendants' motion for change of venue filed before me at 2, 6–8 (Dec. 18, 1989).

---

**6.** When the possibility of prejudice arises from "voluminous [pretrial] publicity," the Ninth Circuit has indicated "the court's voir dire examination should ... [be] directed to the *individual* jurors." *Silverthorne*, 400 F.2d at 639 (emphasis added).

**7.** The government's position is set forth in its opposition to defendant McDonald's motion for change of venue filed before Judge Hauk at 8, 9

**8.** The material submitted so far does not include full copies of the actual articles. The parties may wish to supplement the record to include full copies of the newspaper articles.

Rule 21(b) may be invoked in cases where an offense was allegedly committed in more than one district or division and transfer is in the interest of justice. Discretion as to jurisdiction in such cases is placed in the court. Fed.R.Crim.P. 21(b) advisory committee's note.

The primary concern of Rule 21(b) is to "minimize the inconvenience to the defense." 2 C. Wright, *Federal Practice and Procedure*, Criminal 2d § 343, at 260 (1982). The Supreme Court sets out guidelines for evaluation of Rule 21(b) motions in *Platt*.[9] The factors focus on balancing convenience and hardship to the parties. *United States v. Daewoo Indus. Co., Ltd.*, 591 F.Supp. 157, 165 (D.Or.1984).

### Analysis of Platt Factors

a. *Location of Defendants.* Although defendants move for trial in any district other than Alaska, the Western District of Washington is a potential and natural choice since all defendants reside and conduct business in the Seattle metropolitan area. Although defendants "have no constitutional right to a trial in their home districts," it is a factor to be considered. *Daewoo*, 591 F.Supp. at 160. The location of defendants favors transfer to the Western District of Washington.

b. *Location of Possible Witnesses.* The majority of defendants' material witnesses, both potential and identified, are located in Washington; defendants identify 47 defense witnesses with 37 residing in Washington.[10] According to the government, almost half of its witnesses reside in Washington. Although numbers alone are not sufficient to warrant a change of ven-

ue, inconvenience to such a great proportion of witnesses weighs heavily in favor of transfer to the Western District of Washington.

c. *Location of Events Likely to be in Issue.* The alleged criminal acts set out in the indictment are substantially connected to both the Western District of Washington and Alaska. Although the critical conduct occurred in Barrow, Alaska, where the mayor's office and Department of Public Works are located, virtually all of the financial transactions at issue took place in Seattle. All defendants' offices were also located in the Seattle metropolitan area at the time of the alleged criminal conduct. In their supplemental memorandum in support of motion for change of venue, defendants contend at least 14 of the 19 alleged racketeering acts under count I occurred in Washington, approximately 10 out of 15 overt acts alleged in count 2 occurred in Washington, and all mailings and telephone calls in counts 4–39 occurred in Washington. The government has not disputed these contentions.

Based on location of events likely to be in issue, venue could reasonably be in either Alaska or the Western District of Washington, with the balance tilting in favor of the latter.

d. *Location of Documents and Records Likely to be Involved.* The bulk of documents and records originated in Washington; most are now in the government's possession in Anchorage. After a cursory physical examination of the government "landfill,"[11] the records and

---

**9.** *Platt*, 376 U.S. at 243–44, 84 S.Ct. at 771–72.

**10.** In their supplemental memorandum in support of motion for change of venue, defendants assert 29 of the government's 63 fact witnesses and four of its 18 custodial witnesses are located in Washington. Defendants further contend 65.1% of the government's fact witnesses and 21.8% of its custodial witnesses (for a total 60.5% of all government witnesses) will come from the lower 48 states (the actual location of the government's witnesses has been submitted *in camera*). The government has not supplied any statistical material that would weaken or undermine the figures submitted by defendants.

Defendants also assert approximately 95% of the presently contemplated 47 defense witnesses

are located in the lower 48 (names and locations submitted *in camera*).

**11.** For the benefit of the unwary reader, I hasten to add that "landfill" is a jocular term applied by counsel to the great mass of records largely obtained by the government through subpoenas issued to the various public entities and private businesses involved (including those entities in which defendants were principals). Counsel and I examined this mass of material during our court session in Anchorage in early January. The term "landfill," in turn, generated another jocular phrase: "the five-foot shelf;" this is a reference to the space filled by the black looseleaf notebooks containing the exhibits the government intends to offer at trial As it

materials underlying the government's exhibits, I find transfer and storage of these documents would not be unmanageable nor unduly burdensome to the government. In addition, none of the parties anticipate the likelihood of extensive dipping into the landfill. Defendants cumulatively have the better part of two rooms plus 21–23 metal file cabinets filled with support material, some of which may be required at trial. Not all documents possessed by any of the parties would have to be moved; thus, I consider movement and storage of the parties' documents and records of minimal influence on the transfer of venue.[12]

e. *Disruption of Defendants' Business.* Inconvenience to the parties is an inherent part of any trial. If trial took place in Alaska, both the government and defendants indicate only defendant White's business would be disrupted; however, since defendant White has two partners and efficient communication systems exist in Alaska, I do not find this a pressing argument on behalf of defendants.

f. *Expense to the Parties.* Some degree of inconvenience is inevitable, but travel time and expense would be considerably less for defendants if defendants, witnesses, and counsel did not have to travel to Alaska. Defendants have also indicated their character witnesses will come primarily from the Seattle area.[13] All defendants would prefer trial in the Western District of Washington over Alaska. If venue is changed, the government will incur increased expense. I understand, however, it is the custom for various offices of United States Attorneys to accommodate visiting

prosecutors; therefore, it is unlikely any additional expense to the government would be a major factor since the government will be able to avail itself of government facilities in Seattle or Tacoma. The expense accompanying a change of venue to the Western District of Washington does not preponderate heavily in the government's favor.

g. *Location of Counsel.* Defendants' counsel reside and office in Seattle, Spokane, and Idaho. Counsel have indicated Seattle would be more convenient than Alaska since the distance would be less and the facilities of Seattle counsel or defendants' offices could be shared; however, defendants' counsel would probably find local counsel cooperative in Alaska, thus alleviating some possible hardship. As stated above, government counsel would not be prohibitively inconvenienced by a transfer of venue. Location of counsel is not a significant factor for either side in the setting of this case.

h. *Relative Accessibility of Place of Trial.* The large majority of witnesses for both sides would find the Western District of Washington more accessible than Alaska considering distance, travel time, convenience, and expense.[14] If proximity is not sufficiently critical to tip the balance, a vociferous volcano named Mt. Redoubt may be.[15] Redoubt's first eruptions in twenty-five years began in mid-December 1989; Redoubt has continued to erupt periodically and unpredictably, spewing ash and steam and "sending clouds of gray grit across wide areas" of the state. Anchorage Daily News, Dec. 16, 1989, at A1; Jan. 6, 1990, at

turns out, it would have been more accurate to label that space "the ten-foot shelf."

12. The issue of venue today (especially as it relates to documents) has a different flavor than it did in October–November, 1989. At that time, Judge Hauk moved this case from the District of Alaska to the Central District of California. The government's arguments opposing a change of venue were primarily geared to the disadvantages of the Central District of California as compared to the District of Alaska. Transfer and storage of documents and records to the Western District of Washington does not cause the inconvenience nor entail the excessive cost of a move to California.

13. Defendants have submitted detailed witness lists *in camera.*

14. *Supra* note 10.

15. It may seem strange to any reader (especially the unwary) to find extensive comments relating to the past and possible future activities of a volcano bearing the name Redoubt in an opinion determining venue in a criminal case; Redoubt, however, casts doubt on the practicality of holding a two- to three-month trial in Alaska.

C3. As recently as the week of January 8, 1990, Redoubt erupted one or more times.[16] As a result, two major international carriers (Korean Air and China Airlines) stopped all flights into Alaska until further notice and many have "contingency plans for prolonged diversions." *Id.*, Jan. 16, 1990, at D1. Most international airlines have been scheduling flights one day at a time. *Id.* I do not like to envision more than 100 witnesses reliving the experience of counsel for defendant McDonald when they spent at least two days unsuccessfully trying to get to Anchorage for oral argument scheduled by this court on January 3–5, 1990. At that time all airlines except Alaska Airlines had suspended flights into Anchorage.

Scientists speculate "it could be ... months before the 10,197 foot volcano returns to fitful sleep."[17] *Id.*, Dec. 16, 1989, at A1. The volcano's previous major eruptions began in January 1966 and continued sporadically for over two years. *Id.*

Redoubt presents a substantial efficiency argument for changing venue from Alaska at this time.[18] All parties concede flights into Alaska routinely go though Anchorage; thus, if getting to Anchorage is difficult because of Redoubt, it is probably difficult to get anywhere in Alaska (even though flights are occasionally rerouted to Fairbanks). The unpredictability and probability of volcanic activity could radically disrupt the orderly course of trial. Erratic accessibility is not an asset. Under the circumstances, western Washington is more accessible than Alaska.

i. *Docket Condition of Each District or Division Involved.* Docket condition as such is not a problem since I will preside over the trial wherever it is held. Available space is, however, an analogous and legitimate enquiry. The federal courthouse in Seattle is congested and space is tight. If trial were held in Seattle, the only available courtroom would have to be relinquished to the Court of Appeals one week out of every four. In addition, there is inadequate space available to counsel and no facilities for the jury convenient to the courtroom.[19] Tacoma, however, has adequate space and facilities to accommodate a trial of this magnitude and length. Facilities are available for all counsel (e.g., private offices, telephones, photocopiers, storage for exhibits and other documents, etc.) and for the jury. The United States Attorneys' office is only two blocks from the federal court. The distance from the airport to Seattle and Tacoma is almost equal; traffic from the airport to Tacoma is, however, lighter than that to Seattle. Trial in

---

**16.** Indeed, another eruption occurred during the week of February 12 while the finishing touches were being put on this opinion.

**17.** As is often true, nature imitates art. About a decade ago, a noted singer named Jimmy Buffett issued a record containing the song "Volcano" that expressed feelings apropos to our present circumstances:

> I don't know,
> I don't know,
> I don't know where I'm a-gonna go when the volcano blow.
> But I don't want to land in New York City,
> I don't want to land in Mexico.
> I don't want to land on no Three Mile Island;
> I don't want to see my skin a-glow.
> Don't want to land in Commanche Sky Park, or in Nashville, Tennessee.
> I don't want to land in no San Juan airport or the Yukon Territory.
> Don't want to land no San Diego.
> Don't want to land in no Buzzards Bay.
> I don't want to land on no EyeYatullah.

> I got nothin' more to say.

Words and music by Jimmy Buffett, Keith Sykes, and Harry Dailey. Copyright 1979, Coral Reefer Music and Keith Sykes Music, BMI.

H.K. Management, Inc., the copyright holder of "Volcano," has graciously granted me permission to include the lyrics in this opinion (ensuring that no claim will be made later when this opinion is published). Gratitude is hereby expressed.

**18.** I can find no precedent for changing venue because of an earthquake, hurricane, tornado, flood, volcanic eruption, or other natural disaster; Redoubt, however, appears to be entitled to a modicum of judicial respect.

**19.** In January, after I conferred with Chief Judge Barbara J. Rothstein and Bruce Rifkin, Clerk of the District Court for the Western District of Washington, and after I had informally reported these conversations to counsel, the parties' attorneys joined me in a tour of the available facilities.

Tacoma would not create significant inconvenience to the majority of witnesses.

This court assures the parties proper facilities can be provided in Tacoma for the length of time necessary to conduct a full and fair trial.

Overall, analysis of the *Platt* factors favors defendants' motion to change venue.

The government further contends time is too short to make the move now. *United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974), requires an elevated burden of proof as to inconvenience when close to trial; however, change of venue was sought in *Polizzi* a mere eight days before trial. This is not the case here. The parties prepared once for trial in November, 1989; all of the parties now have reasonable lead time to refresh their trial preparations. The record indicates preparations for trial readiness have moved along smartly since reassignment of this case after Judge Hauk's recusal order. We conferred in Anchorage in early January even though that session was "bob-tailed" due to travel problems created by the volcano. In late January, hearings were held in Seattle; all parties were aware trial was firmly set to begin March 19, 1990. That date will be kept barring some unforeseen and legitimate grounds for a continuance.

Policy considerations deserve some weight in assessing the fairness of venue. It is important in criminal cases for the community to be confident wrongdoing conducted in its state against its citizens is penalized. In this case, however, the greater dedication of time and added expense for lengthy travel to Alaska, together with the potential difficulties and hazards created by the unpredictable Redoubt, makes bringing more than 75 Washington witnesses to Alaska impractical and imprudent.

After seriously canvassing all options available to me, I grant defendants' motion to change venue for the convenience of the parties and witnesses and in the interest of justice. Tacoma, Western District of Washington, will be the trial site;[20] trial will commence March 19, 1990.

IT IS SO ORDERED.

---

**20.** I reserve the right to amend this opinion if the circumstances warrant.